Kathryn CLAIBORNE, Plaintiff,

v.

FRITO–LAY, INC., Defendant.

No. CIV–3–88–245.

United States District Court,
E.D. Tennessee, N.D.

March 23, 1989.

Jerrold L. Becker, Knoxville, Tenn., for plaintiff.

Bernard E. Bernstein, Knoxville, Tenn. and Edmund M. Kneisel, Kilpatrick and Cody, Atlanta, Ga., for defendant.

## MEMORANDUM OPINION

JORDAN, District Judge.

This is a diversity action brought by the plaintiff, Kathryn Claiborne, against the defendant, Frito–Lay, Inc., for alleged breaches of an employment contract and the tort of outrageous conduct or intentional infliction of emotional distress. [Doc. 1.] The plaintiff predicates her claim of breach of an employment contract on the defendant's employee handbook. The defendant has filed a motion for summary judgment. [Docs. 10, 10A.] The plaintiff has responded [Docs. 16, 20] and the defendant has filed a reply [Doc. 23]; the motion is now ripe for disposition.

The plaintiff was employed by the defendant on July 4, 1982, and at that time was given a copy of the employee handbook, "Welcome to the Frito–Lay Sales Team," which was "prepared to provide ... information about [her] job ... and to explain certain company policies." A copy of this handbook was filed with the complaint. Initially, the plaintiff was employed as an extra or substitute salesperson temporarily assigned to sales routes while the regular route salesperson was on leave, on vacation, out sick, etc. In November, 1982, the plaintiff obtained a regular route, which she worked until January, 1983, when she was diagnosed with multiple sclerosis and was forced to take medical leave. She continued on medical leave until March 7, 1983; she then returned to work, choosing to resume her position as an extra rather than to return to her regular route due to the physical strain of the regular route. The plaintiff continued working as an extra until July, 1984, when she was again required to take a medical leave due to a recurrence of her condition. She was able to return to her job in January, 1985. Her supervisor assigned her as an extra to a rural route in a mountainous area, despite the supervisor's awareness that she had a disabling condition that could be exacerbated by stress and despite her seniority over other employees. This route assignment, in a cold and rugged climate, caused the plaintiff to experience sinusitis and aggravation of her multiple sclerosis, requiring her to take another medical leave in February, 1985.

In September, 1985, the plaintiff returned to her employment as extra salesperson. A suitable route became available and she bid on it, believing that her seniority would entitle her to this route; however, the route was awarded to an employee with less seniority. When she complained she was told her seniority was affected by her medical leaves. She pursued the company's grievance procedure, claiming that nothing in the handbook indicated that a loss of seniority would result from medical leave. In November, 1985, she was given a route that was well-suited to her physical condition. She was able to work this route without problems until April, 1987, when the defendant decided to transfer the plaintiff's route to the Account Sales Division, effectively eliminating her route. The plaintiff understood from alleged prior practice that she would be assigned to the next available route, regardless of her se-

niority status, and that she would be compensated for the loss of her route. The defendant, however, refused to suspend the bidding system or to award the plaintiff another route. The plaintiff resumed her position as an extra salesperson and was required to work strenuous routes that exacerbated her disability, causing her to take another medical leave at the end of July, 1987.

In December, 1987, the plaintiff filed a grievance complaint concerning the defendant's failure to assign her another regular route. In February, 1988, she returned to work as an extra. At this time, the plaintiff alleges that she was subjected to repeated harassment by her supervisor. The plaintiff alleges that this harassment consisted of phone calls from her supervisor during early morning hours, conflicting orders from two supervisors, and reprimands that she was taking longer than other employees to complete her assignments. After her grievance was denied, she was assigned to an out-of-town route but subsequently experienced a relapse of multiple sclerosis. She was forced to take another medical leave and has not returned to work since that time.

■■■ The plaintiff claims that the handbook given to her when she became employed forms a part of her contract of employment and that the actions of the defendant breached the terms and conditions set out in the handbook. The law is well-settled in Tennessee that, absent a contract to the contrary, employment is at will. *E.g.*, *Graves v. Anchor Wire Corp. of Tennessee*, 692 S.W.2d 420 (Tenn.App. 1985). For an employee handbook to be considered part of a contract of employment, the language used must be phrased in binding terms, interpreted in the context of the entire handbook, and read in conjunction with any other relevant material, such as an employment application. *Whittaker v. Care–More, Inc.*, 621 S.W.2d 395, 397 (Tenn.App.1981). *See also MacDougal v. Sears, Roebuck and Company*, 624 F.Supp. 756, 759 (E.D.Tenn.1985). In *Hamby v. Genesco, Inc.*, 627 S.W.2d 373 (Tenn.App.1981), an employee handbook

was written in such unequivocal terms that it was considered to be contractual in nature. *Id.*, at 376. Any language that preserves a unilateral right on the part of the employer to alter or modify the contents of the handbook, however, would generally preclude considering it as a contract and would indicate that the handbook simply constituted a set of guidelines or a source of information for an employee.

■■■ In this case, the company handbook states in its preface that the "employment relationship is of free will" and that the company's "commitment ... is that [it] will be consistent and fair." The handbook expressly declares that it does not attempt to be comprehensive but merely provides basic information about the employment and explains "certain company policies." In § 17, Working Together, of the handbook, it reiterates that

"Agreement with the outlined company standards of performance and conduct is your decision. The free will nature of our employment relationship provides you the option to voluntarily resign your employment should you determine that these important standards are in excess of the commitment you are willing to make."

Taking these sections together, the employment relationship between the defendant and the plaintiff was at will. Further, § 30, Concluding Remarks, reserves to the company "the right to make changes to the material contained in this guide from time-to-time to meet changing conditions and business needs."

Although the plaintiff argues that the sections on Seniority and Employee Status (§ 14), Guidelines for Route Bidding (§ 18), and Route Revision (§ 19) are sufficiently specific and binding, the Court must conclude from the qualified language found in the entire handbook that it does not form a contractual relation. The Court recognizes that the defendant's handbook is not a model of draftsmanship and that it contains a number of omissions and ambiguities; however, these defects indicate that a contractual relation was not being defined by the company, as more careful wording

would have been used in such a case. *Cf. Hamby v. Genesco, Inc., supra,* at 376 (language stated that the policies, procedures, and practices were guaranteed).

Moreover, assuming for argument that the handbook does constitute a contract, the Court finds that the conduct of the defendant did not amount to a breach of any of the provisions of the handbook. In § 14, the defendant states that its seniority program is intended "to insure that all permanent, full-time employees are treated equitably in areas such as route bidding, vacation, eligibility, scheduling, and layoffs should they occur." Although the handbook does not expressly state that medical leave will affect seniority, the handbook does provide that "[s]eniority is based on the length of *continuous full-time* service with Frito–Lay." (Emphasis added.) Furthermore, route assignments are made through a bidding procedure in which "[a]ny permanent, full-time salesmen or extra salesmen is eligible to bid on a route vacancy," and "[s]eniority within that work group *and other conditions* will be verified, and the route award will be announced to the work group." (Emphasis added.) If seniority alone determined who would be awarded routes, the bidding system would be superfluous; thus, the defendant clearly may consider other factors than seniority in deciding to whom to award sales routes. In addition, the elimination of a route is a company prerogative retained under § 19, route revisions, and, therefore, the elimination of the route in April, 1987, could not form a breach of any purported contract term. Nothing in the handbook implies that a route, once awarded, becomes a vested right; rather, § 19 of the handbook directly precludes such a conclusion. Finally, neither § 19 nor any other section contains any provision that requires the company to make temporary assignments to extra salespersons on the basis of seniority.[1]

The complaint also makes allegations that the defendant intentionally inflicted emotional distress upon her by engaging in harassment. To state a cause of action for outrageous conduct, a "defendant's conduct must be so outrageous in character and extreme in degree as to be beyond the pale of decency and that it must have caused serious mental injury to the plaintiff." *Goldfarb v. Baker,* 547 S.W.2d 567, 569 (Tenn.1977). Whether the conduct alleged crosses the threshold to permit the case to go to trial is a question for the trial court in the first instance. *Bryan v. Campbell,* 720 S.W.2d 62, 64 (Tenn.App. 1986). At its worst, the defendant's conduct does not approach that degree of extremity necessary to cross the threshold. These parties may not have gotten along well and the plaintiff may even be justified in believing that she was treated unfairly by the defendant, but such friction is often a part of employment; however, assuming that the plaintiff was subjected to unfair treatment, such conduct would not amount to outrageous conduct.

"Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized community."

*Id.* The defendant's conduct could not be considered so intolerable as to be described as outrageous.

Accordingly, no material question of fact having been shown and viewing the undisputed evidence in the light most favorable to the plaintiff, the Court concludes as a matter of Tennessee law that the employee handbook cannot constitute a contract of employment and that the actions of the defendant described by the plaintiff do not rise to the level of outrageous conduct. The Court, nevertheless, sympathizes with

---

**1.** The plaintiff also claims that the defendant violated § 8, Equal Employment Opportunity, of the handbook by discriminating against her on the basis of her handicap or disability. This section, however, is unequivocally an expression of company policy and nothing more. Any such alleged discrimination would be covered by statutes such as T.C.A. § 8–50–103, which prohibits discrimination against the handicapped. The plaintiff did not, however, allege such a cause of action.

the plaintiff's plight but is bound by the law. The Court, therefore, GRANTS the defendant's motion for summary judgment.