IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 25, 2009 Session

## IN THE MATTER OF: JOHN USSERY, ET AL. v. THE CITY OF COLUMBIA

**Direct Appeal from the Circuit Court for Maury County**
**No. 9928     Stella L. Hargrove, Judge**

---

**No. M2008-01113-COA-R3-CV - Filed June 1, 2009**

---

Appellees, employees of Appellant City of Columbia, filed a class action suit against the City, seeking step raise promotions based upon merit. Appellees brought their suit under breach of contract theories, claiming that the City was contractually obligated to pay the raises based upon contract(s) arising from a 1984 employee handbook and certain pay ordinances passed by the City. The trial court held that the1984 Handbook was a contract, which the City had breached, and that the ordinances gave rise to an implied contract entitling the Appellees to damages on grounds of detrimental reliance. The City appeals. We reverse in part and affirm in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed in Part, Affirmed in Part**

J. STEVEN STAFFORD, J., delivered the opinion of the court, in which ALAN E. HIGHERS, P.J., W.S. and DAVID R. FARMER, J., joined.

Charles Timothy Tisher, Columbia, TN and William Nelson Bates, Nashville, TN, for the Appellants, City of Columbia

Phillip Leon Davidson, Nashville, TN, for the Appellees, John Ussery and Brad Collins

### OPINION

On September 5, 2000, Appellees John Ussery and Brad Collins, police officers with the Appellant City of Columbia (the "City"),[1] filed a class action suit against the City pursuant to Tenn. R. Civ. P. 23. In the Complaint, Messrs. Ussery and Collins allege that the City breached a contractual duty to give police officers pay step increases in compliance with the employee

---

[1] Mr. Ussery was hired on December 12, 1994. Mr. Collins was hired on February 3, 1997.

handbooks and certain ordinances passed by the City regarding pay and benefits. The complaint was later amended to add a claim under the theory of promissory estoppel/detrimental reliance. The City filed an answer denying the allegations. On February 8, 2001, Messrs. Ussery and Collins filed a motion to certify the class, which motion was granted by Order of March 12, 2001. For purposes of this Opinion, we will refer to the Plaintiffs/Appellees as the "Class."

On March 20, 2003, the City moved for summary judgment, which motion was denied by the court's order of June 3, 2003. Thereafter, the parties agreed to bifurcate the case–with the issue of liability tried first, then a second trial on damages. The liability portion of the trial was held on December 3, 2003. The issues before the court at that trial were: (1) did the City Employee Handbooks, and certain City ordinances constitute contracts between the City and the Class, and (2) did this evidence entitle the Class to a judgment on grounds of detrimental reliance. In its January 26, 2004 Order, the trial court held, in relevant part, as follows:

> 1. That all City employees hired as of September 1, 1994 are entitled to a merit step increase for each year they were recommended by the City Manager until they reach the last step available to them in the pay plan ending June 30, 2000.
>
> 2. That all City employees hired prior to July 1, 1997 are entitled to have their salary anniversary date to be the date they were hired.

Following the court's ruling on liability, the parties filed their respective calculations of damages in mid-April of 2004. By letter of April 28, 2004, the trial court ruled that "calculation of damages will be based upon the compensation owed to each employee, which is the amount equal to a step increase based upon merit or performance, starting at the employee's pay anniversary date, together with compound interest calculated each year based upon the step increase." An order on the ruling was entered on May 11, 2004.

A Special Master was appointed to hear the issue of damages. The trial court ultimately adopted the Special Master's recommendations concerning calculation methodology and amount of damages. By Order of May 5, 2008, the trial court awarded damages to the Class in the total amount of $2,086,739.56 and adopted, by reference, its previous order on liability entered on January 26, 2004. The City appeals[2] and raises two issues for review as stated in its brief:

> I. Defendant appeals the trial court's finding that pay ordinances passed by the City of Columbia were contracts between the City of Columbia and its employees entitling the employees to retroactive raises relative to the time each such ordinance was in effect.

---

[2] On appeal, the City is represented by counsel who did not initially represent it in the trial court.

II. Defendant appeals the trial court's finding that the 1984 Employee Handbook for the City of Columbia constituted a contract between the City of Columbia and its employees entitling the employees to retroactive raises during the time the handbook was in effect.

In the posture of Appellee, the Class raises the following additional issues:

I. Did the trial court commit error by granting the City's Tenn. R. Civ. P. 60.02 motion for relief?

II. Was the trial court correct in determining that the Plaintiffs proved detrimental reliance against the City.

III. Was the trial court correct in adopting the report and recommendation of the Special Master on Damages.

We will first address the Class's issue concerning the trial court's grant of Tenn. R. Civ. P. 60.02 relief to the City. The first step of this inquiry is the question of whether the trial court was correct in proceeding under Tenn. R. Civ. P. 60. The City's motion was filed within thirty days of the entry of the trial court's order, and it should be deemed a motion to alter or amend the judgment under Tenn. R. Civ. P. 59.04. *Henson v. Diehl Machines, Inc.*, 674 S.W.2d 307, 310 (Tenn. Ct. App. 1984) (citing *Campbell v. Archer*, 555 S.W.2d 110, 112 (Tenn. 1977)). Like Rule 60.02(1), Rule 59 can provide relief from a judgment on account of mistake, inadvertence, surprise, or excusable neglect. *Henson*, 674 S.W.2d at 310. When a case has not been fully adjudicated, the trial court should treat a Rule 60.02 motion as a motion to alter or amend under Rule 59.04. See *Savage v. Hildenbrandt,* No. M1999-00630-COA-R3-CV, 2001 WL 1013056, at *10 (Tenn. Ct. App. Sept. 6, 2001).

Appellate courts review decisions dealing with Tenn. R. Civ. P. 59.04 and Tenn. R. Civ. P. 60.02 under an abuse of discretion standard since these requests for relief are "addressed to the trial court's discretion." *McCracken v. Brentwood United Methodist Church*, 958 S.W.2d 792, 795 (Tenn. Ct. App.1997); *accord Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003). An appellate court is not permitted to substitute its judgment for that of the trial court under an abuse of discretion standard. *Henry* 104 S.W.3d at 479; *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn.2001). Only when a trial court has "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining" is the trial court found to have abused its discretion. *State v. Stevens*, 78 S.W.3d 817, 832 (Tenn.2002) (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn.1997)).

## Tenn. R. Civ. P. 59 Relief from Sanctions

On February 21, 2001, the Class filed a Motion for Sanctions against the City concerning alleged violation of the rules of discovery. Specifically, the Class alleges that the City failed to

comply with the trial court's order of February 1, 2000, requiring the City to answer the discovery requested by the Class. The trial court ordered the City to respond to discovery by March 12, 2001 and awarded the Class its attorney's fees.

On March 13, 2001, the Class filed a second Motion for Sanctions, alleging that the City had failed to comply with the March 12, 2001 order. On April 30, 2001, the Class filed a Motion for Contempt against the City and, on May 31, 2001, the Class filed a Motion to Compel against the City. The motions were continued at the request of the City until June 22, 2001. On that day, the City failed to appear and the trial court issued an Order giving the City until June 29, 2001 to comply with all of the court's orders.

On July 2, 2001, the Class filed the Affidavit of its attorney, stating that the City had not complied with the court's orders. On July 6, 2001, the City filed a motion asking the court not to enter an order on sanctions. In support of this motion, the City filed an Affidavit, stating that it was not aware of the June 22, 2001 hearing.

On June 22, 2001, the court entered an order, finding the City "to be in willful contempt of the orders of [the court]." Sanctions were assessed at $50.00 per day, beginning June 29, 2001, for every day the City failed to pay the court-ordered attorney's fees. The court further held that the City had failed to answer discovery, and ordered that the City fully answer by close of business on June 29, 2001. On July 10, 2001, the City gave notice that it had paid the ordered attorney's fees.

On July 12, 2001, the Class filed a motion for partial summary judgment on grounds that the court's order of July 9, 2001 required the City to answer discovery by close of business on June 29, 2001 or the facts set out in the complaint would be "deemed established [and] no affirmative defense to the plaintiff's complaint would be allowed." Based upon this holding, the Class argued that the City had failed to comply with the order, and that, because no affirmative defense could be pled, the Class was entitled to summary judgment on the issue of liability.

On August 8, 2001, the City filed its motion to set aside the order for sanctions, and the court heard the motion on August 24, 2001. The court subsequently entered its Order on the motion declining to set aside the fines ordered in the July 9, 2001 order. However, the court granted the motion as to the court's ruling "requiring Defendant to admit facts in Plaintiff's complaint and plead no affirmative defenses." The Class now argues that this ruling was in error.

At the hearing on the motion, the City argued that its notice of the June 22, 2001 hearing was flawed both in terms of timing and substance. That being said, the City does admit to its failure to comply with the court's ruling on the motion for contempt. Counsel for the City states:

> The City did comply with the order of the Court in terms of discovery.

-4-

The City did not comply with the contempt part; that is, the payment of attorneys' fees, which goes to the court's sanctions on contempt.

In reaching its decision to affirm the award of attorney's fees, but to set aside the sanction concerning affirmative defenses, the court states, in relevant part:

> [T]he court understands [the Class's] frustration. [The City] was aware certainly by June, at our last hearing when the sanctions were granted, that–that you had had considerable difficulty in dealing with the ineptness on the part of the...City and trying to get their attorney....
>
> It's a shame and I think it's appalling that the City did not have in place some checks and balances to monitor this case....
>
> This case was filed back in...September 5 of 2000; so it's almost a year old. But clearly as of March of 2001, the City was in–certainly in serious trouble with this court.... I think it's appalling. I don't see any excuse on the part of the City as to why things happened like they did in this case.
>
> ...[The court] makes a finding that notice was properly given, that the City was put on notice certainly of all issues that were going to be addressed by the court that day, if by nothing else, by the history of these motions that have been filed and...continued one after another, and the court does find sufficient notice to bring the City into the court that day.

We have reviewed the record in this case, and conclude that the trial court's assessment of the handling of this case by the City (at least at the early stages of the litigation) is accurate. Consequently, we cannot conclude that the trial court's decision to affirm the award of sanctions constitutes an abuse of discretion. Concerning the court's decision to lift the sanctions issued under Tenn. R. Civ. P. 37, the court states:

> The court's inclined, however, to look closely at this serious relief under Rule 37.3 and will at this point reconsider that sanction.
>
> *                              *                              *
>
> [O]verall, the court does find that the interest of justice requires and the principles of equity requires that the court set this sanction aside, and will do so at this time.

Considering the harsh result that would ensue from the court's not allowing the City to make affirmative defenses, and in light of the conduct giving rise to the sanctions, we conclude that the court did not abuse its discretion in relieving the City of this portion of the ordered sanctions. The order of the trial court on the City's motion for relief is, therefore, affirmed.

Turning to the City's issues, we first note that, because these issues were tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R.App. P. 13(d). Furthermore, when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn.1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See id.*; *see also Walton v. Young*, 950 S.W.2d 956, 959 (Tenn.1997).

## 1984 Handbook

The City issued two employee handbooks to its employees. The first was effective until June 30, 1997 (the "1984 Handbook"), and the other was effective from July 1, 1997 going forward (the "1997 Handbook"). The trial court specifically found that the 1997 Handbook contained sufficient language to establish that it was not a contract and, therefore, its terms were not enforceable.[3] The class has not appealed the finding. The issue before us involves the trial court's determination that the 1984 Handbook constitutes a contract between the City and the Class. Under the heading "General Information," the 1984 Handbook provides, in relevant part, that:

> This booklet is provided to answer questions for employees of the City of Columbia. It will provide facts on personnel matters and describe many subjects which will be of interest to you. If you have any questions regarding anything written or not written in this booklet, feel free to call upon your Department Head, who will either know the answer or where to find it.

Under the heading "Employee Policies," the 1984 Handbook provides:

---

[3]The 1997 Handbook contains an "Acknowledgment of Receipt [of] Employee Handbook," which was signed by William E. Gentner, City Manager. This acknowledgment, dated June 1, 1997, provides, in relevant part, that "[t]his handbook does not constitute a legal contract with the City." *See, also, McDougal v. Sears Roebuck & Co.*, 624 F.Supp. 756 (E.D. Tenn. 1985).

The City of Columbia publishes an employee policies manual, which provides details on many things you should know concerning your employment. Each department head has a complete set of policies and if you desire, please ask your department head to review all or any of those policies with you. You may also contact the Personnel Director to clarify any policy that you do not understand.

Under the heading "Performance Evaluation, the 1984 Handbook reads, in pertinent part:

Regular employees, both part-time and full-time, receive written evaluations of their work performance. The evaluation period begins on the day of assignment to a position and continues for a period of 365 days. That evaluation period will remain in effect until your job and pay grade change. At that time you would begin a new evaluation period. Step increases may be considered at the end of the evaluation period.

Approximately six months after your evaluation period begins, your immediate supervisor should conduct a mid-year review of your work performance with you. This is recorded on the form used for evaluations, and requires your initials to verify that it has been done. If you have not had your mid-year review at the appropriate time, you should remind your supervisor that it should be done. During this review, your supervisor should point out areas in which you could improve, so that at the end of the rating period, you should be aware of your individual strengths and weaknesses.

Under the heading "Pay," the 1984 Handbook states:

Every job has a written description which establishes the job classification and sets the pay range. Each job has at least a 7-step range unless your job is seasonal or temporary. You will be eligible to receive consideration for a one step increase annually.

Step Increase Consideration: Step increases are based upon your performance. They may be considered one year after you are hired, and that step increase date will remain in effect throughout your career. If you are assigned to another position which changes your pay grade, a new step increase date will be assigned, and that date will remain in effect until another such grade reassignment occurs. Seasonal and temporary workers are not eligible for step increases.

The issue on appeal is whether these terms create a contractual obligation binding the City. The record indicates that the 1984 Handbook was given to every employee on the date they were hired. Between 1984 and July 1, 1997, there was no other personnel policy, nor were there any civil service rules in effect to guide the City employees concerning pay matters. Unlike the 1997 Handbook, the 1984 Handbook contains no language stating that the earlier handbook is not a contract.

In *Whittaker v. Care-More, Inc.*, 621 S.W.2d 395, 397 (Tenn.Ct.App.1981), this Court held that, in order to be considered as an employment contract, an employee handbook must contain "guarantees or binding commitments."[4] However, even in the absence of a definite durational term, an employment contract still may exist with regard to other terms of employment. *Williams v. Maremont Corp.*, 776 S.W.2d 78, 80 (Tenn.Ct.App.1988); *accord Hooks v. Gibson*, 842 S.W.2d 625, 628 (Tenn.Ct.App.1992). This Court has previously recognized that an employee handbook can become a part of an employment contract:

> The employer-employee relationship is contractual in nature. 53 Am.Jur.2d Master and Servant § 14 (1970). *See, also, Seals v. Zollo*, 205 Tenn. 463, 327 S.W.2d 41 (1959). The employer-employee relationship is the product of an agreement or series of agreements between the employer and employee, including, but not limited to, the nature of the work to be performed, the duration of the employment and the terms and conditions of the employment.

*Hamby v. Genesco, Inc.*, 627 S.W.2d 373, 375 (Tenn. Ct. App. 1981); *accord Davis v. Connecticut Gen. Life Ins. Co.*, 743 F.Supp. 1273, 1278 (M.D.Tenn.1990).

In order to constitute a contract, however, the handbook must contain specific language showing the employer's intent to be bound by the handbook's provisions. *Smith v. Morris*, 778 S.W.2d 857, 858 (Tenn. Ct. App. 1988). Unless an employee handbook contains such guarantees or binding commitments, the handbook will not constitute an employment contract. *Whittaker*, 621 S.W.2d at 397. As stated by one court, in order for an employee handbook to be considered part of an employment contract, "the language used must be phrased in binding terms, interpreted in the context of the entire handbook, and read in conjunction with any other relevant material, such as an employment application." *Claiborne v. Frito-Lay, Inc.*, 718 F.Supp. 1319, 1321 (E.D.Tenn.1989).

Based upon the foregoing authority, the trial court specifically held that the City was contractually bound by the following terms (which the court derived from the language of the 1984 Handbook as set out above):

---

[4] In *Whittaker*, the employee handbook stated: "An employee may reasonably expect uninterrupted employment year in and year out. Any employee doing his work in a satisfactory manner and working for the good of the organization has little to fear about job security." *Id*. at 397.

(1) That all employees would receive a written evaluation of their performance.

(2) That this evaluation is to be conducted each year beginning one year after they were hired.

(3) That each employee's evaluation date is the date they were hired.

(4) That this evaluation date was to remain constant for each employee unless promoted.

(5) That each evaluation date is each employee's pay anniversary date. (Step increase date)

(6) That all step increases awarded employees must be based on merit/performance.

The City attacks these findings on three grounds: (1) that the language used in the 1984 Handbook is permissive rather than mandatory; (2) that, even if the 1984 Handbook is a contract, same was repealed in part by the passage of Ordinance No. 3023; (3) that the 1984 Handbook cannot be deemed a contract because same is in conflict with the City Charter and the Pay Ordinances. We will address each of these grounds in turn.

In support of its argument that the language used in the 1984 Handbook is permissive, the City relies upon the following excerpt, which is found under the heading "Pay" in the handbook (*see* above for full context): "Step increases are based upon your performance. They **may** be considered one year after you are hired...." (Emphasis added). As noted above, an employee handbook must be interpreted in the context of the entire handbook, and read in conjunction with any other relevant material...." ***Claiborne***, 718 F.Supp. at 1321. Turning to the language of the 1984 Handbook, as set out in full context above, the handbook provides that: (1) "[r]egular employees, both part-time and full-time, **receive** written evaluations of their work performance. The evaluation period **begins** on the day of assignment to a position and **continues** for a period of 365 days. That evaluation period **will** remain in effect until your job and pay grade change...;" (2) "[y]ou **will be eligible** to receive consideration for a one step increase annually;" (3) "[s]tep increases **are based** upon your performance. They may be considered one year after you are hired, and that step increase date **will remain** in effect throughout your career;" (4) "[i]f you are assigned to another position which changes your pay grade, a new step increase date **will be assigned**, and that date **will remain in effect** until another such grade reassignment occurs...." (Emphasis added). The mandatory language used in these phrases lends support to the trial court's findings that employees are entitled to written evaluation. This language is neither ambiguous nor too vague to be enforced.

The City next contends that, even if we find the 1984 Handbook to be contractual in nature (which we do), same was repealed in part by the passage of Ordinance No. 3023. Ordinance No.

3023 became effective on January 1, 2006, and changed the anniversary dates of employees whose original anniversary date fell between January 1, 1996 and June 30, 1996. The City's argument is flawed as it presumes that the fact that the City may unilaterally change any provision of the handbook necessarily renders the entire contents of the handbook unenforceable.

While consideration is necessary for every contract, mutuality of obligation is not required unless lack of mutuality will leave one party without consideration for his or her promise. *See Dobbs v. Guenther*, 846 S.W.2d 270, 276 (Tenn. Ct. App. 1992). There is also the factor of performance to consider. If one party to an agreement performs substantially his part of the agreement, lack of mutuality of obligation cannot be available to the party who received the benefit of that performance. *Frierson v. Int'l Agr. Corp.*, 148 S.W.2d 27 (Tenn. Ct. App. 1940). As the trial court correctly found, the City obtained the services of these employees (and there is no argument in record that the services were less than satisfactory); consequently, the City is obligated to perform under the provisions of the handbook. *See, e.g., Jeffers v. Hawn*, 212 S.W.2d 368 (Tenn. 1948).

The record also indicates that all employees received consideration for a pay step raise during the relevant time period. The City Manager testified, in relevant part, as follows:

> Q. And, in fact, you–during the time you were City Manager, every employee did receive consideration for step increases based upon merit or performance; is that not correct?
>
> A. Yes, they did.

From this undisputed testimony, the trial court found that, once an employee received consideration for a step increase, that consideration was to be based upon performance or merit. Moreover, once an employee did receive a step increase, his or her anniversary date would remain the same until the employee was promoted or assigned a new position. From the record as a whole, we find no error in this holding.

The City next argues that the City Charter invalidates the provisions of the 1984 Handbook. We have read the record, and it appears that the City raises this argument for the first time on appeal. Generally, issues not raised at trial may not be raised for the first time on appeal. *State Dept. of Human Servs. v. Defriece*, 937 S.W.2d 954, 960 (Tenn. Ct. App.1996) (citing *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn.1991)); *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn.1983)). For the reasons discussed below, the City's argument on this issue does not affect the outcome of this matter; accordingly, we find the issue waived.

Even though we affirm the trial court's finding that the 1984 Handbook rose to a contractual level, our review of the provisions of that Handbook reveal that the handbook only guarantees that the employees will receive an annual review. There is nothing in this handbook mandating that the City pay these raises. By its plain language, the handbook (at most) only obligates the City to review

the employees annually.  In its order on liability, entered January 26, 2004, the trial court held, in relevant part, that:

> The language of the 1984 Handbook <u>does not</u> contractually require the City to pay step increases each year, <u>but</u> when the City did pay step increases they were to be based on merit, or the performance of the City employees.

(Emphasis in original).  We agree with the trial court's statement.  Consequently, those employees falling under the 1984 Handbook had only a contractual right to their annual reviews; they did not have a contractual right to the payment of the step raises (at least under the language of the 1984 Handbook).  That being said, the record reveals that the employees were, in fact, given their annual reviews (although the step raises were not forthcoming).  From the record before us, it appears that the City did not, in fact, breach the mandates of the 1984 Handbook because the City did review the employees on an annual basis. Although the City was required to review the employees under the handbook, we cannot go so far as to say that the handbook requires the City to pay the step raises following the review.  Because of this, we reverse the trial court's holding that there was a breach of the contract arising from the 1984 Handbook. Consequently, the employee's sole recourse for actual payment of the step raises would, necessarily, have to be found in the ordinances.

## Ordinances

We have reviewed all of the ordinances admitted into evidence at the hearing.  In the interest of judicial brevity, we do not reproduce all of the ordinances for purposes of this Opinion.  However, a brief discussion of the relevant language contained therein is helpful.  Trial Exhibits 4 through 6 contain the following language:

> <u>Section 2</u> That, for employees, to be hired or who are currently employed in grades 1-15, the employee **shall** normally start work at step 1 of that pay grade or initial employment, and **shall** move to step 2 following one year of service.
>
> Employees **will** move to step 3 following two years of service and continue each year until they top out at step 7.
>
> The City Manager, on recommendation of the department head, annually **shall** award the step increases or withhold the step increases, based on performance.
>
> <u>Section 3</u>...(contains the same language for grades 16-19).

(Emphasis added).  Exhibit 8 (adopted June 27, 1996) contains the following, relevant language:

-11-

The Master Salary for all regular fulltime employees outlines a five-step career path with seven percent increases at each step. All employees who fall in between the steps of the Master Salary Schedule **will** receive a seven percent salary increase on their salary anniversary date when accompanied with an acceptable performance evaluation. Employees **will** continue to receive increases until they top out at step five.

All fulltime employees **will** receive their merit increases based on an acceptable performance evaluation **provided the City has funds** for salary increases for all fulltime employees.

(Emphasis added). Trial Exhibits 9 through 18 contain the same language, which grants merit pay increases based on recommendation and performance if funds are available. Although there are numerous ordinances, based upon the similar language used, we find it unnecessary to treat each ordinance separately.

As noted above, the Class plead only breach of contract (express or implied) arising from the handbooks and/or the ordinances. In choosing to travel under contract theory, the Class put itself in a position to have to overcome the presumption that ordinances and statutes are not contractual in nature. ***See Dodge v. Bd. of Educ. of Chicago***, 302 U.S. 74 (1937). In ***Dodge***, the State of Illinois passed a series of laws, know as the Miller Law, pertaining to the mandatory and voluntary retirement of teachers, and which included the payment of annual sums to the teachers who retired in accordance with the law. The Illinois Legislature subsequently added to, changed, and repealed parts of the law. The changes included reductions in the amounts paid to retired teachers, and the affected teachers challenged the law on grounds that the original statute was a contract guaranteeing them the annual payments. The Board argued that the payments to be made were pensions, subject to revocation or alteration at the will of the Illinois Legislature, and the Illinois Supreme Court agreed. ***Id***. at 78. In reviewing that decision, the United States Supreme Court gave guidance on the question of whether a statute creates a contractual obligation:

The parties agree that a state may enter into contracts with citizens, the obligation of which the Legislature cannot impair by subsequent enactment. They agree that legislation which merely declares a state policy, and directs a subordinate body to carry it into effect, is subject to revision or repeal in the discretion of the Legislature. The point of controversy is as to the category into which the Miller Law falls.

In determining whether a law tenders a contract to a citizen, it is of first importance to examine the language of the statute. If it provides for the execution of a written contract on behalf of the state, the case for an obligation binding upon the state is clear. Equally clear

-12-

is the case where a statute confirms a settlement of disputed rights and defines its terms. On the other hand, an act merely fixing salaries of officers creates no contract in their favor, and the compensation named may be altered at the will of the Legislature. This is true also of an act fixing the term or tenure of a public officer or an employee of a state agency. The presumption is that such a law is not intended to create private contractual or vested rights, but merely declares a policy to be pursued until the Legislature shall ordain otherwise. He who asserts the creation of a contract with the state in such a case has the burden of overcoming the presumption. If, upon a construction of the statute, it is found that the payments are gratuities, involving no agreement of the parties, the grant of them creates no vested right.

***Dodge***, 302 U.S. 74, 78-79; ***see also Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.***, 470 U.S. 451, 465-66 (1985). Applying this standard, the Supreme Court affirmed the Illinois Supreme Court's holding that the Illinois Legislature did not intend to create a binding contract with the teachers of that state. Under ***Dodge***, the Class has the burden to prove that the ordinances clearly create an obligation that is binding upon the City.

In this case, the trial court stopped short of holding that the ordinances constitute an express contract between the Class and the City. Rather, the court determined that the ordinances give rise to an implied contract in law. It is well settled that a contracts implied in law are imposed on grounds of reason and justice, without regard to the assent of the parties. ***See, e.g., Scandlyn v. McDill Columbus Corp.***, 895 S.W.2d 342 (Tenn. Ct. App. 1994). In order to prove the existence of an implied contract, the party seeking the finding has the burden to prove that a benefit was conferred upon the non-moving party, that the non-moving party appreciated the benefit, and received the benefit under such circumstances that it would be inequitable for the non-moving party to retain the benefit without payment of the value thereof. ***See, e.g., Paschall's Inc. v. Dozier***, 407 S.W.2d 150, 154 (Tenn. 1966). In ***Cummings v. Brodie***, 667 S.W.2d 759 (Tenn. Ct. App. 1982), this Court discussed the requisites for a finding of implied contract:

> [A]ny conduct from which a reasonable person in the offerees' position would be justified in inferring a promise in return for the requested act, amounts to an offer, and that such a request might be implied when the facts and circumstances are such that the person receiving the benefit of the work expects to be compensated.

***Cummings***, 667 S.W.2d. at 764.

In finding an implied contract, the trial court determined that, "[i]n effect, the City used the pay ordinances to control its work force's work performance and behavior. The City knew its employees were performing well based on the belief [that] they would receive a merit pay increase and took advantage of this." We have reviewed the appellate record, and we conclude that this

finding is not supported by a preponderance of the evidence. Here, the members of the Class seek pay increases for work that they were already expected to do under the member's respective job description. Implicitly, the members of the Class are expected to do that work to the best of their knowledge and ability. In so doing, the members may be eligible for step increases based upon that performance. We find no evidence in the record that the employees did extra work, worked longer hours, or otherwise changed their usual course as a result of the promise of a step increase. Consequently, we can find no detrimental reliance on the part of the Class. The trial court's finding that the City used its ordinances to somehow control its workforce and to spur them to go beyond their particular duties stretches the contents of the record to an untenable conclusion. This finding, however, does not necessarily lead us to conclude that the Class had no remedy under the ordinances. However, that remedy does not lie in contract.

In reaching its conclusion that the City is liable for payment of the step raises, the trial court relies heavily upon the case of ***Steurmer v. City of Chattanooga***, 914 S.W.2d 917 (Tenn. Ct. App. 1995). In ***Steurmer***, the City of Chattanooga passed an ordinance that required the City to compensate police officers for work performed. The City, however, never paid the officers, claiming that the City Council did not pass a budget with pay increases sufficient to compensate the officers under the ordinance. Unlike the plaintiffs in the instant case, the plaintiffs in ***Steurmer*** did not proceed on a breach of contract theory. Rather, the court in ***Steurmer*** was faced with the issue of whether the City of Chattanooga had violated its ordinances. Although the trial court, in its January 26, 2004 order, states that the issue for the ***Steurmer*** Court was "whether the City should be ***contractually*** bound by its ordinances," from our reading of the case, there is no indication that the ***Steurmer*** Court ever addressed the question of whether the ordinances constituted contracts. ***Id.*** at 919 (emphasis added). Rather, relying upon the well-established rules of statutory construction (which are also applicable to the interpretation of ordinances, ***see infra***), the ***Steurmer*** Court simply found that the intent of the ordinances, as expressed in the plain and unambiguous language thereof, had been violated by the City of Chattanooga.

The City is correct that the facts of ***Steurmer*** are not precisely on point with the case at bar. In ***Steurmer***, the plaintiffs sought back pay commensurate with the work they had done. Here, the Class seeks raises for the same work. However, this fact does not negate a comparison between the present case and ***Steurmer***. Moreover, the fact that the ordinances in ***Steurmer*** had been repealed does not preclude a comparison of these two cases because the issues are similar. The issue decided by the ***Steurmer*** Court was whether the City of Chattanooga should be bound by certain ordinances during the period they were in effect, and the court so held. ***Id***. at 918. Likewise, the case at bar involves the question of whether the City of Columbia should be bound by the pertinent ordinances during the effective period.

In retrospect (or perhaps with better foresight), it is clear to this Court that the Class's decision to proceed under breach of contract theory, and specifically its failure to simply plead a violation of the ordinances based upon the plain and unambiguous language thereof, complicates the analysis in this case, especially in light of our finding above that the ordinances do not reach the level of a contract implied in law. However, the fact that the Class did not plead violation of the ordinance

does not preclude the trial court from determining the issue if it was tried by the consent of the parties. "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Tenn. R. Civ. P. 15.02. Moreover, the movement away from the harsh and technical procedural rules is evident from reading the first rule, which expressly states that the rules "shall be construed to secure the just, speedy, and inexpensive determination of every action." Tenn. R. Civ. P. 1. Most significant to the issue at hand is Rule 8, which states that "[n]o technical forms of pleading or motions are required," Tenn.R.Civ. P. 8.05(1), and that"[a]ll pleadings shall be so construed as to do substantial justice ." Tenn. R. Civ. P. 8.06; *see Anderson v. DTB Corp*., No. 89-172-11, 1990 WL 33380, at \*2 (Tenn. Ct. App. Mar. 28, 1990) (stating the Tennessee Rules of Civil Procedure "do not require and, in fact, admonish courts against exalting form over substance"). Moreover, our courts are not bound by titles. *Estate of Doyle v. Hunt*, 60 S.W.3d 838, 842 (Tenn.Ct.App.2001); *see also Bemis Co., Inc. v. Hines*, 585 S.W.2d 574, 576 (Tenn.1979). To the contrary, "a trial court is not bound by the title of the pleading, but has the discretion to treat the pleading according to the relief sought." *Norton v. Everhart*, 895 S.W.2d 317, 319 (Tenn.1995) (citing *Fallin v. Knox County Bd. of Comm'rs*, 656 S.W.2d 338, 342 (Tenn.1983); *State v. Minimum Salary Dep't of A.M.E. Church*, 477 S.W.2d 11, 12 (Tenn.1972)). This principle of construction applies to motions as well as pleadings. *Anderson*, 1990 WL 33380, at \*2.

Turning to the record, we find that, although not specifically pled, the question of whether the ordinances were violated was tried by the consent of the parties. Therefore, the issue before us is whether the City violated its ordinances on their face. This is a question of law with our review being *de novo* upon the record with no presumption of correctness. *See* Tenn. R.App. P. 13(d).

As the trial court correctly notes, when construing an ordinance, a court should follow the rules of statutory construction. *Loggins v. Lightner*, 897 S.W.2d 698 (Tenn. Ct. App. 1994). A Court should assume that the governing body that passed the ordinance used every word in the ordinance purposely and that the use of each word conveys some intent. *Dixon v. Hollard*, 70 S.W. 30, 33 (Tenn. 2002). Courts may assume a legislative body says in a statute what it means and means in a statute what it says. *Lucchess v. Alcohol and Licensing Comm'n of Memphis*, 70 S.W.3d 49 (Tenn. Ct. App. 2001).

Based upon the non-precatory language used in these ordinances (*see* highlighted language above), the trial court determined that the ordinances "w[ere] plain and without [need of] forced interpretation." The court determined that the effect of the ordinance language was that the City Manager, on recommendation of the department head, *shall* award or withhold step increases, based upon performance and, by later ordinance, funding. The City argues that the trial court's ruling was in error, and asserts several grounds in support of its position.

The City first argues that the ordinances are too indefinite to be enforced. The trial court heard the following, relevant, testimony, concerning the intent of the City in passing these ordinances. When asked what the purpose of a step increase was, former City Manager Mr. Genter testified that the "purpose of a step is to provide, based on performance, money for potential raises."

-15-

Concerning the City's intent as to the criteria that must be met in order for an employee to receive a step raise, Mr. Genter further testified as follows:

> Q. So the criteria that was [sic] used when you were employed by the City for step increases was based on merit, is that correct?
>
> A. It was based on performance.
>
> *        *        *
>
> Q. Mr. Genter, what is the purpose of a step?
>
> A. Well...what we are attempting to do is evaluate annually an employee. At the time I was manager, I think there were approximately nine areas that we annually evaluated an employee on. And it was on that basis on which the department head would report back to me on that form the performance of that employee. Based on that information from the department head, I would grant a step increase.
>
> Q. Let me ask you, do you remember giving a deposition on November the 30th of 2001?
>
> A. Yes...
>
> Q. On page 15 I'm going to ask you if you remember me asking you this equation and giving this answer.
>
> A. Sure.
>
> Q. The first question I asked you was: Do you remember what the purpose of a step is? And you[r] answer was, "The purpose of a step is to provide, based on performance, money for potential raises." Do you remember giving that statement?
>
> A. Yes, I do.
>
> Q. It also–and this is also part of your statement: "It also gives the employee an idea as to what each step represents in terms of a potential pay increase.

Mr. Genter's testimony is corroborated by the City's answer to discovery:

1.  List all criteria for employees to receive step pay increases for 1993 to present.

ANSWER: The compensation plan from 1993 to 2000 was based upon merit.  July 1, 2000, the plan was restructured to a 3% longevity step plan that the City still has.  Each year throughout the budget process, the City Council reviews and adopts a budget with the pay increases in the budget well allowed for.

This testimony, when taken in light of the plain language of the ordinances, leads us to conclude that the intent of the City in passing these ordinances was to provide an opportunity for pay increases based upon quality of work (i.e., merit or performance), as opposed to cost of living increases or longevity pay.  The language reveals that these employees were entitled to the step raises so long as the raise was recommended by the department head, and the funds were available.  The City argues that the ordinance language is too indefinite to enforce.  We disagree.  The language of the ordinances is plain and unambiguous.  The procedure for obtaining the merit increases is clear on the face of the ordinances.  The question, then, is whether the City followed the mandates of the ordinances.

Despite the fact that the City continued to pass the pay ordinances (virtually unchanged) from year to year, the City admits that, during the relevant time period, no pay raises were given based upon performance or merit: "It is the position of the City of Columbia that all pay raises given to the City's employees during the time period covered by this lawsuit were not based on performance or merit."  The City's Finance Director, Ms. Baltzer, testified, in relevant part:

Q.  Were these pay ordinances...when they have a pay raise or salary increase contained in them for the City employee, those increases are based on tenure, is that not correct?

A.  For the most part, yes.

Q.  Well, let me ask you, do you remember giving a deposition on November 30, 2001?

A.  Yes.

Q.  On page 12, I asked you–actually on page 11, you were asked a question and your response, which actually came on page 12, was this–I want to ask if you remember making the statement, "Now you can call it an annual increase, or you can call it a step increase, or you can call it a merit system so it depends on your terminology.  It's just called a salary increase, not necessarily a step increase."  And I asked

-17-

you, okay. And you answered, "It's really only a step on your tenure in that position."

Do you remember giving that testimony?

A. Yes, sir.

The record further indicates that, despite the fact that these employees were recommended for step increases and were approved by the City Manager, these raises were not forthcoming. Rather, the City paid cost of living increases and longevity pay, which were paid to all employees regardless of performance.

Under the ordinances, failure to pay these raises would be justified under two conditions: (1) the employee was not recommended for a raise by his or her department head, or (2) the raises were not funded. We have reviewed the testimony adduced at the hearing on liability and it supports the trial court's finding that the employees were reviewed, considered, and recommended for the step raises each year, and that the raises were, in fact, approved by the City Manager. Concerning the funding of these raises, Ms. Baltzer testified, in relevant part, as follows:

> Q. And it says–part of this–it say that the City Manager on recommendation of the department head shall award a three percent merit increase or withhold increase based on performance and funds available. Do you see that?
>
> A. Yes, sir.
>
> Q. When this ordinance was passed the employees would know whether funds were available at the time, because there is [a] concurrent appropriation ordinance passed at the time, isn't it?
>
> A. That is correct.
>
> Q. And the City appropriates the funds for these raises at the time the same time those pay ordinances are adopted, isn't it?
>
> A. That is correct.
>
> Q. And the City appropriated the funds for these raises at the same time these pay ordinances are adopted, doesn't it?
>
> A. Yes, sir.

-18-

Ms. Baltzer's testimony that the raises were funded is not disputed in the record, nor does the City proffer any evidence to the contrary. Consequently, we conclude that the record supports the trial court's conclusions that the ordinances entitle the employees to step raises based upon performance, that the criteria for paying the raises was met, and that the City, in failing to actually pay the Class, violated the ordinances. Following *Steurmer*, we find that this violation triggered the City's liability to the Class. Thus, while we agree with the trial court's finding on liability, we do so for a different reason. See *Hopkins v. Hopkins*, 572 S.W.2d 639, 641 (Tenn. 1979) ("[T]his Court will affirm a decree of the trial court correct in result, though rendered upon different, incomplete or erroneous grounds."). The trial court's finding on this issue is affirmed.

## Writ of Certiorari

The City raises the argument that the exclusive remedy for the Class was a writ of certiorari. It is well settled that issues not raised at the trial cannot be raised for the first time on appeal. *See LaVernge v. Southern Silver, Inc.*, 872 S.W.2d 682 (Tenn. Ct. App. 1993). However, even if we consider that the City's argument, we nonetheless conclude that the argument is without merit. Tenn. Code Ann. §27-8-101 states, in relevant part, that:

> The writ of certiorari may be granted whenever authorized by law, and also in all cases where an inferior tribunal, board, or officer exercising judicial functions has exceeded the jurisdiction conferred, or is acting illegally, when, in the judgment of the court, there is no other plain, speedy, or adequate remedy....

In this case, there has been no action by an inferior tribunal, board or officer exercising judicial functions. Moreover, the plaintiffs had an adequate remedy stemming from violation of the ordinances.

Having found that the City violated the plain language of the ordinances and that, in so doing, it violated the intent of those ordinances as stated therein and supported by the proof at trial, we now turn to address the City's issue concerning the award of damages.

## Damages

As noted above, this case was bifurcated for trial. We have affirmed the findings made by the court following the liability portion of the trial. Moreover, all of the criteria for giving the step raises were met in this case (i.e., employees were reviewed and recommended, and the ordinances were funded). In short, the only violation by the City was in its failure to actually pay the raises. The record indicates that, while the City employees were given cost of living and longevity raises, these raises were (admittedly) not based on performance, which is what the ordinances and handbook required:

The fact that the City, on different occasions, gave employee[s] raise[s] based upon years in service and increase in the cost of living is commendable, but not germane to the claims of the employees of the City of Columbia.

The City argues that the trial court's ruling that the employees are entitled to damages for step raises results in a windfall for the employees because they also received cost of living and longevity increases. We disagree. While the ordinances clearly provide for these cost of living and longevity payments, they also provide for a separate class of raises based solely on performance.

We have reviewed the evidence presented to the Special Master and find it to be exhaustive. Based upon this evidence, the Special Master issued his report and recommendations on October 31, 2006. In a section of the report titled "Discussion of Difference between Parties Approaches to Calculating Damages," the Special Master states, in relevant part, that:

> Each time an ordinance passed by the City granted a new COLA (i.e., cost of living adjustment), that COLA was included in the Skill Level Charts attached to the ordinance authorizing it, resulting in each step (or the minimum and maximum, depending on presentation in that ordinance) of each pay grade of the Skill Level Charts being increased by the amount of the COLA. Also, the percentage increases authorized by ordinances, and reflected in those Skill Level Charts between steps, were affected by the inclusion of the COLA's, with the percentage increases usually being applied to amounts from Skill Level Charts in addition to those prior amounts being increased by COLA's.

The Special Master further stated:

> I believe the Plaintiff's inclusion of those COLA's in compensation which should have been paid is correct, and have provided for their inclusion in the Matrix. To omit COLA's from calculations of compensation which should have been paid would ignore the obvious intention of the City, authorized by ordinances, reflected in Skill Level Charts attached to those ordinances and expressed by the method actually used by the City in practice, to pay employees both COLA's and percentage increases they received in Actual Compensation.
>
> The City contends [that] inclusion of the COLA's in calculations of compensation which should have been paid will result in employees receiving more money in damages "than they would have received if the City had correctly paid the employees in the applicable year."

(Def. BR. §C, ¶2, March 13, 2006, attached as Exhibit F). In that document, the City provides a chart for the hypothetical employee showing actual pay, the percentage increases resulting from that actual pay, and compares those percentage increases to what it states was the City's percentage pay plan.

What is not made clear from the Defendant's chart is that the actual percentage increases in compensation reflected in the chart, which in most years exceed what the City calls the percentage increases reflected in the City's pay plans, are created by actions the City itself authorized by ordinances and implemented through compensation it actually paid. When the City, in the chart, states percentage for the pay plan, it ignores the rest of the increases ordinances authorized using COLA's and/or implementation schedule attached to Ordinance 3023, and included in the pay plan through the Skill Level Charts and implementation schedule.

To omit the COLA's from calculations of compensation which should have been paid would result in calculated damages amounts which do not reflect the Court's orders. That treatment, by omission, of the COLA's and other increases actually authorized and paid, in calculation of compensation which should have been paid, reflects the City's position that the Court ordered an employee's total compensation should be a percentage step increase each year, and only a percentage step increase each year.... That position seemingly ignores the Court's obvious knowledge [that] employees had actually received compensation which included COLA's and other increases, and the Court's statement of page 14 of its January 26, 2004 Ruling.

> The City has not introduced any evidence regarding the nature of the longevity raises or cost of living raises other than it claims the employees have no damages because they were given longevity raises and cost of living raises.

\*                                    \*                                    \*

The quoted sentences are the Court's acknowledgment [that] COLA's and longevity increases have been paid. With the knowledge, the Court still held:

> ...damages in this [case] will be calculated based upon the compensation *owed* each employee, which is an

amount equal to a step increase based upon merit or performance, starting at each employee's anniversary date, together with compound interest calculated each year based upon the step increase. (Emphasis supplied)

*                              *                              *

Under the Court's orders, the City promised to pay amounts specified by ordinances and the attached Skill Level Charts, in a manner provided by the 1984 Handbook and the ordinances. Under the Court's orders, that promise to pay is not limited to the percentage increases in the City's pay plans from year to year.

Patricia Dorney Baltzer, the City of Columbia Finance Director and the City's witness on damages, acknowledged during the Special Master's Examinations [that] she had not used the Orders of the Court in forming her opinion as to how damages should be calculated.

From our review of the Special Master's proceedings, it appears that the period for assessment of damages was September 5, 1994 through September 5, 2000. Because there was no actual breach of the 1984 Handbook, no damages should be given based upon raises allegedly due thereunder. Rather, as discussed above, the damages in this case arise from the City's violation of its ordinances. Consequently, damages were properly calculated from the date of the enactment of the ordinances at issue in this case. We find no error in the assessment period arrived at by the Special Master.

The trial court reviewed the Special Master's two reports and recommendations, one on the issue of methodology and one on the amount of damages. The trial court concluded, based upon the preponderance of the evidence, that the Special Master's methodology and amount were correct. We have reviewed the evidence presented on damages, and conclude that the evidence does not preponderate against the Special Master and the trial court. There is sufficient evidence to support the judgment.

For the foregoing reasons, we reverse the order of the trial court to the extent that it finds that the there was a breach of the contract arising from the 1984 Handbook, and to the extent that it finds that the ordinances give rise to an implied contract upon which the employees detrimentally relied. We affirm the award of damages based upon the City's violation of its ordinances. Costs of this appeal are assessed against the Appellant, The City of Columbia, and its surety.

_____

J. STEVEN STAFFORD, J.