RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0117p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

-----

TERRY L. FREEZE and EARNEST D. COLVIN,

*Plaintiffs-Appellants,*

DORIS FREEZE,

*Plaintiff,*

*v.*

CITY OF DECHERD, TENNESSEE; BETTY DON HENSHAW, SCOTTY MOORE, JOHNNY ETHERIDGE, JEFF STRATTON, and ROSS PETERSON, individually and in their official capacities,

*Defendants-Appellees.*

No. 12-6160

-----

Appeal from the United States District Court
for the Eastern District of Tennessee at Winchester.
No. 4:10-cv-00014—Harry S. Mattice, Jr., District Judge.

Argued: June 20, 2013

Decided and Filed: June 4, 2014

Before: MOORE and GRIFFIN, Circuit Judges; SARGUS, District Judge.[*]

-----

## COUNSEL

**ARGUED:** Kerry Knox, Murfreesboro, Tennessee, for Appellants. T. William A. Caldwell, ORTALE, KELLEY, HERBERT & CRAWFORD, Nashville, Tennessee, for Appellees. **ON BRIEF:** Kerry Knox, Murfreesboro, Tennessee, for Appellants. T. William A. Caldwell, W. Carl Spining, ORTALE, KELLEY, HERBERT & CRAWFORD, Nashville, Tennessee, for Appellees.

-----

[*]The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

1

SARGUS, D.J., delivered the opinion of the court in which, MOORE, J., joined. GRIFFIN, J. (pp. 14–15), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

SARGUS, District Judge.    This appeal presents the question of whether two police officers possess a property interest in their continued employment.  The district court held that they do not.  We hold that they do.  We therefore **REVERSE** the judgment of the district court and **REMAND** this case for proceedings consistent with this opinion.

## I.

### A.

In 2002, Terry Freeze was hired by the City of Decherd's (the City or Decherd) Police Department.  He was promoted to Chief of Police in August of 2007.  Earnest Colvin, Freeze's brother-in-law, worked as a patrolman in Decherd beginning in November of 2007.  The City's Board of Mayor and Aldermen (the Board) is responsible for hiring and firing the City's employees.  During the events leading up to this case, the Board consisted of Mayor Betty Don Henshaw, Alderman Scott Moore, Alderman Johnny Etheridge, and Alderman Jeffrey Stratton.

Two meetings in 2009 provide most of the factual background for this case.  The first came on February 25, 2009, when Alderman Moore met with Freeze and Alderman Etheridge to discuss a number of issues with the police department.  Freeze testified that Alderman Moore convened the meeting; Moore testified that Freeze, in fact, requested the meeting.  Either way, the meeting's first order of business was a discussion about the proper procedure for buying dog food for the City's police canine.  Those present soon moved to a more serious topic, as Etheridge told Freeze that Mayor Henshaw did not care for Freeze's wife.  According to Freeze, the Aldermen told him that they "might need to just let [him] resign as the Chief and put [him] in as a sergeant at $15 an hour."  R. 26-1 at 9.  Freeze indicated that he felt "outnumbered," *id.* at 10, and told the Aldermen that "if it's going to keep my job, yes, I will take a demotion," *id.* at 11.  Two days later, Moore told Freeze that he discussed the new employment arrangement with

Mayor Henshaw, as well as with Aldermen Etheridge and Stratton. Soon thereafter, Freeze asked Mayor Henshaw "if it was going to be all right with her" if he took the demotion. *Id.* at 16. According to Freeze, she said it was and "that she went out on a limb to hire [him], anyway." *Id.*

The parties met again on March 9, 2009, this time during a regularly scheduled open Board meeting. The meeting was eventful. Joseph Madden, another police officer for the City, was present. He nearly came to blows with a City employee over his suspension for an on-the-clock car accident. Neither Colvin, Freeze, nor several other officers present intervened to subdue Madden. After Madden was escorted from the meeting, the Board voted to terminate his employment. Colvin then became angry and accused Alderman Moore of lying about a harassment charge that Colvin had filed against him. Following this exchange, the Board voted to terminate the employment of Colvin and Freeze. As for why, Alderman Stratton said in subsequent testimony that he voted to terminate Freeze because "Decherd needed to move on," and that he voted to terminate Colvin because "[h]e was kin to the chief." R. 33-10 at 12. In his deposition, Alderman Etheridge testified that Freeze had previously said "that he was more or less disgusted with his job." R. 33-3 at 17. Etheridge based his vote for Colvin's termination on Colvin's failure to intervene in Madden's dispute, which he called conduct "unbecoming of a police officer," *Id.* at 10; Alderman Etheridge also "just didn't think [Colvin] was doing his job," *id.* at 14.

Freeze and Colvin claim that, at the time of discharge, no grounds were given for their terminations, other than for the "betterment" of the city. R. 25-2 at 2; R. 25-3 at 2. They claim that the Board did not notify them that their terminations would be considered at the March 9, 2009 meeting. The meeting's agenda made no reference to considering their terminations. For her part, Mayor Henshaw had no knowledge that their terminations were to be considered. The City admits that it did not provide Freeze and Colvin with written notice that their terminations would be considered at the March 2009 meeting. The City does claim, however, that it provided Freeze and Colvin with oral notice that "their general job performance may be discussed." R. 25-5 at 2. Neither Freeze nor Colvin were provided an opportunity to present witnesses or evidence at the meeting, and the Board did not provide them with a hearing on the merits.

On March 12, 2009, Freeze requested a hearing before the Board. Mayor Henshaw denied the request in a letter dated March 23, 2009, explaining that "[t]he City does not conduct such a hearing." R. 25-3 at 2. The separation notice regarding Freeze's termination reads: "Action of city board to dismiss – No reason given." R. 25-4 at 26–27. Mayor Henshaw later filed a document with the Tennessee Department of Labor and Workforce Development regarding Freeze's separation. R. 33-6 at 62. As the "final incident that caused the discharge," Mayor Henshaw wrote that the "Board felt that the Decherd Police Department needed to go in a new direction." *Id.* Mayor Henshaw also wrote that Freeze violated the Tennessee Uniform Purchasing Act. *Id.* The City now admits that Freeze did not violate the Tennessee Uniform Purchasing Act, as no such law exists.

**B.**

Two pieces of legislation that the City enacted prior to Freeze's or Colvin's employment also figure prominently in this case. The first came in November of 1999, when the Board adopted Resolution 8-99 to govern the personnel policies of the City (the Personnel Resolution). The Personnel Resolution designates every city worker as an at-will employee. The resolution also states that its terms should not be construed to create a property right in employment.

A few months later, in January of 2000, the Board adopted Resolution R-01-00—the Decherd Police Department Policies and Procedures Manual (the Police Resolution). The Police Resolution governs the employment relationship between the City and its police-department employees. Section 2 of the resolution states that "all resolutions or parts of resolutions [that] conflict" with the Police Resolution "are hereby repealed to the extent of that conflict." R. 33-6 at 54. The Police Resolution states that "discipline shall be for cause and shall follow the basic concepts of due process." *Id.* at 55; *id.* at 56. The legislation also provides for an agency policy to "avoid terminating an otherwise productive member when conduct, behavior or performance problems occur, if possible." *Id.* at 55. When a situation does call for discipline, the Police Resolution directs "th[e] agency" to follow five steps of "a progressive system when practicable." *Id.* In addition, it allows for termination resulting from economic conditions, performance failure, or for "substantial impairment of the employment relationship." *Id.* at 58.

Finally, according to the terms of the Police Resolution, "[w]henever disciplinary action is used," an employee must be informed in writing of the "exact offense violated." *Id.* at 58–59.

## C.

Following their terminations, Freeze and Colvin filed suit against the City, Mayor Henshaw, and Aldermen Moore, Etheridge, and Stratton (collectively referred to as the City). Freeze and Colvin allege that they were terminated in violation of (a) their due process rights under 42 U.S.C. § 1983, (b) the Tennessee Open Meetings Act, Tenn. Code Ann. §§ 8-44-101–201, and (c) Tennessee common law. Colvin asserts a fourth claim for a violation of the Tennessee Public Protection Act. *See* Tenn. Code Ann. § 50-1-304. Freeze and Colvin moved for partial summary judgment on their due process claims, contending that they had a reasonable expectation of continued employment and were fired without notice, explanation, or an opportunity to respond. The City also moved for summary judgment, asserting that Freeze and Colvin had no property interest in continued employment and that their due process claims therefore failed. The district court, after referring the motion to a magistrate judge, agreed with the City. It held that Freeze and Colvin did not have a property interest in continued employment and, therefore, could not maintain their due process claims. It also declined to exercise supplemental jurisdiction over the state-law claims and therefore dismissed the case. Freeze and Colvin argue on appeal that the district court erred as to each of these conclusions.

## II.

"We review a district court's grant of summary judgment *de novo*." *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *CareToLive v. FDA*, 631 F.3d 336, 340 (6th Cir. 2011). Appellate courts reviewing grants of summary judgment may affirm on any grounds supported by the record. *Babcock & Wilcox Co. v. Arkwright–Boston Mfg. Mutual Ins. Co.,* 53 F.3d 762, 767 (6th Cir. 1995).

**III.**

Based on 42 U.S.C. § 1983, Freeze and Colvin contend that the City terminated their employment in violation of their Fourteenth Amendment right to due process.[1]  We undertake a two-step inquiry when confronted with due process claims.  *Mitchell v. Fankhauser*, 375 F.3d 477, 480 (6th Cir. 2004); *see Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538–39, 545–46 (1985).  The district court addressed only the first step of this inquiry in concluding that Freeze and Colvin's due process claim failed.  We start at the same place and, according to the first step, ask whether Freeze and Colvin have established that they had a protected property interest in their continued employment (which would thus entitle them to due process protections).  *See Mitchell*, 375 F.3d at 480; *Brown v. City of Niota*, 214 F.3d 718, 720 (6th Cir. 2000); *Gregory v. Hunt*, 24 F.3d 781, 785 (6th Cir. 1994) ("An at-will public employee does not have a property interest in continued employment unless it can be shown that the employee had a reasonable expectation that termination would be only for good cause.").

**A.**

We look to state law to determine whether Freeze and Colvin had a reasonable expectation that their termination would be only for good cause.  *See Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *see also Perry v. Sindermann*, 408 U.S. 593, 601 (1972).  The law in Tennessee operates under a broad presumption that employees are at will and, by default, lack a property right in their continued employment.  *England v. Andrews*, No. 2:05-0008, 2005 WL 2209542, at *7 (M.D. Tenn. Sept. 8, 2005); *see also Chism v. Mid-South Milling Co.*, 762 S.W.2d 552, 555 (Tenn. 1988) ("The doctrine of employment at will has long been recognized in [Tennessee], with the concomitant right of either party to terminate such a

---

[1]Colvin argued below that Tennessee Code Annotated §§ 38-8-304 and 305 provide for a property right in his employment.  Both pertain to police-officer discipline.  The former could be read to mandate written notification and a chance to respond for a police officer before discipline, *see* Tenn. Code Ann. § 38-8-304; and the latter to mandate a pre-termination hearing, *see id.* § 38-8-305.  The district court did not find this argument persuasive. Colvin mentions the statutes only in the facts section of his briefing and thus waives the argument.  *See Leary v. Daeschner*, 228 F.3d 729, 741 n.6 (6th Cir. 2000).  Even if read as properly raising the issue, we also find it unpersuasive.  Tennessee Code Annotated § 38-8-309 instructs that the above statutes apply only to agencies—unlike the agency at issue here—"that have no other established procedures for dealing with the dismissal, demotion, suspension or transfer for punitive reasons of police officers."  *See Lisle v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 73 F. App'x 782, 786 (6th Cir. 2003); *see also id.* ("While the officers could contend that they were transferred for punitive reasons and therefore were within the statute's ambit, this statute only provides a default rule that can be overridden by local regulation.").

relationship with or without cause."). Tennessee courts read this presumption to mean that employees cannot claim an interest in continued employment unless they first prove that a contract governed the terms of employment. *See Woods v. Metro. Dev. & Hous. Auth. Bd. of Comm'rs*, 345 S.W.3d 903, 909 (Tenn. Ct. App. 2011).

Freeze and Colvin appeal to this latter point in an effort to save their due process claim. They base their property interest on the Police Resolution that the Board passed in January of 2000. According to their argument, this Resolution created a contract that changed their status from at-will employees to those with a property right in continued employment, which includes the right to termination only for good cause. The Police Resolution was passed as an employee manual, which Tennessee courts have consistently held "can form a contract between the employee and the employer." *Id.* "In order to constitute a contract, however, the handbook must contain specific language showing the employer's intent to be bound by the handbook's provisions." *City of Niota*, 214 F.3d at 721 (citing *Rose v. Tipton Cnty. Pub. Works Dep't*, 953 S.W.2d 690, 692 (Tenn. Ct. App. 1997)). Freeze and Colvin must meet a heightened standard in this case. In *Brown v. City of Niota*, we held that a high standard applies in order for a handbook or manual to create not just a contract, but also a property right to termination only for good cause: the handbook must "contain[] unequivocal language demonstrating [the employer's] intent to be bound by the handbook's provisions." *City of Niota*, 214 F.3d at 721 (internal quotation marks omitted) (citing *Reed v. Alamo Rent-A-Car Inc.*, 4 S.W.3d 677, 688 (Tenn. Ct. App. 1999)). In this case, then, in order for the Police Resolution to create an expectation of continuing employment requiring dismissal only for good cause, it must contain unequivocal language demonstrating the City's intent to be bound by its provisions.

**B.**

In turning to the case at hand, we hold that the facts here meet this high bar. First, the Police Resolution does contain unequivocal language demonstrating the City's intent to be bound by the handbook's provisions. Section 2, for example, provides "[t]hat all resolutions or parts of resolutions in conflict herewith are hereby repealed to the extent of that conflict." R. 33-6 at 54. Put another way, it plainly states that the Police Resolution trumps any other conflicting agreements pertaining to police-officer employment. We read Section 2's language as an

unequivocal statement of the City's intent to be bound by its provisions according to Tennessee law. *See Reed*, 4 S.W.3d at 688 ("[There is] no clearer way for an employer to express its intent to be bound by a handbook's provisions than the employer's specific statement that the document represents the parties 'entire agreement of employment' and that the employer 'promises and agrees to abide by all its terms and conditions.'"). The City could have included language expressing its intent not to be bound. *See id.* (noting that there is "no clearer way for an employer to express its intent not to be bound by an employee handbook's provisions than the . . . specific statement that [it] is not a contract or that [it] should not be construed as a contract"). The Personnel Resolution—enacted before the Police Resolution—did just this. But the City did not rest on this language. It instead issued another resolution that, as we explain below, conflicted with the Personnel Resolution and established a contractual relationship between the police officers and the City.

Second, the Police Resolution also contains unequivocal terms demonstrating an intent to be bound to an agreement prohibiting termination without good cause. It states in plain language that "discipline *shall be for cause and follow the basic concepts of due process*." R. 33-6 at 56 (emphasis added). As a general matter, a wide variety of courts have held that the use of the terms "shall" or "will" creates a binding obligation. *See, e.g., Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion."); *Baar v. Jefferson Cnty. Bd. of Educ.*, 311 F. App'x 817, 825 (6th Cir. 2009) (holding that the language "[n]o employee . . . shall be disciplined . . . without just cause" creates a property interest in the just-cause discipline requirement); *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 860 n.3 (Tenn. 2002) (finding the use of the word "shall" in the Model Rules of Professional Conduct to be a "mandatory duty"). As to this case, the language at issue accords with that in cases where Tennessee courts have found the existence of an employment contract. *See, e.g., Williams v. Maremont Corp.*, 776 S.W.2d 78, 80 (Tenn. Ct. App. 1998) (noting "employees *will* be recalled in the order of seniority" (emphasis added)); *Hamby v. Genesco, Inc.*, 627 S.W.2d 37, 376 (Tenn. Ct. App. 1981) (noting that the handbook "*shall* be The Guaranteed Policies, Practices and Procedures" (emphasis added)).

More to this second point, the Police Resolution's plain language also sets this case apart from the City's reliance on cases such as *Pate v. Wallace*, 188 F.3d 508, nos. 98-5632 & 98-5633, 1999 WL 701897 (6th Cir. Sept. 2, 1999). There, we held that an employee manual did not confer a property interest in continued employment. *See id.* at *6. The *Pate* manual stated at the outset that it was "not intended to constitute an employment contract between the Upper Cumberland Development District and its employee." *Id.* Further, the manual stated that "[e]mployees are free to resign from [the government agency] whenever they wish, and [the government agency] is not restricted from terminating an employee at any time for reason." *Id.* The *Pate* manual also noted that an employee "may be dismissed for cause with no advance notice." *Id.* These clauses led the court in *Pate* to conclude that the manual did not rise to the level of a contract. *See, e.g., id.* ("Here, the manual provisions are prefaced by an unequivocal statement that the provisions cannot form the basis of an employment contract."). The Police Resolution at issue here does not contain any language similar to any of these clauses. Instead, it provides for one unqualified, undiluted, and mandatory requirement regarding discipline—it "*shall* be for cause." R. 33-6 at 55 (emphasis added); *id.* at 56 (same).

Third, Tennessee law requires us to interpret the Police Resolution "in the context of the entire handbook." *Rose*, 953 S.W.2d at 692. Nothing in the Police Resolution's text takes away from the requirement that any discipline, including termination, "shall be for cause." The City thinks differently and points to a provision in the Police Resolution noting that termination could be based on the "decision[] of the Chief of Police as permitted and retained by law." R. 33-6 at 58. It argues that this language falls in line with Tennessee law holding that "'[a]ny language that preserves a unilateral right on the part of the employer to alter or modify the contents of the handbook' generally precludes the handbook from being considered an employment contract." *Rose*, 953 S.W.2d at 693–94 (quoting *Claiborne v. Frito-Lay, Inc.*, 718 F. Supp. 1319, 1321 (E.D. Tenn. 1989)). We disagree. Allowing the Chief to fire employees in a manner consistent with the law does nothing to alter the terms of the handbook. It also clearly differs from the language at issue in other cases where courts have reached the opposite conclusion. *See Claiborne*, 718 F. Supp. at 1321 ("In this case, the company handbook states in its preface that the 'employment relationship is of free will' and that the company's 'commitment . . . is that [it] will be consistent and fair.'"); *Rose*, 953 S.W.2d at 693 (where the handbook contained a

provision directly stating "that its policies are subject to change without notice by [the employer]"). Finally, the language to which the City points does nothing to change the mandate that any kind of discipline under the terms of the handbook be for cause.

In reaching this conclusion, we address two final issues as they pertain to contracts, employee manuals, and property interests in employment under Tennessee law. Both relate to our prior decision in *City of Niota*. There, the Tennessee city of Niota's board of commissioners voted to terminate the employment of two police officers. *See* 214 F.3d at 719–20. The officers appealed, arguing that a previous employee-termination rule promulgated by the board created an interest in continued employment. *See id.* at 720. We disagreed and held that the termination rule did not convey a property interest in their continued employment. *See id.* at 721–22. The facts here distinguish this case from *City of Niota* and compel a different conclusion.

As an initial difference, we held in *City of Niota* that the termination rule at issue did not create a contract between the city and its police officers. *See id.* at 721. In doing so, we pointed to the "permissive" language of the rule, specifically that "the board of commissioners 'may' fire a[n] employee." *Id.* We then contrasted this language with the "cases in Tennessee courts [that] have found an employment contract to exist"—those where "the employee handbook contained the mandatory terms 'shall' and 'will.'" *Id.* In this case, by contrast, we have already held that the language at issue *did* convert the employee manual to a contract. And we have already explained that this language included terms "shall" and "will" in the context of termination.

Another difference centers on Tennessee's term-of-years presumption. Tennessee courts presume that "employment for an indefinite term may be terminated at any time . . . without cause." *Woods*, 345 S.W.3d at 909. The manner in which we relied on this presumption in *City of Niota* does not apply here. There, we rejected "plaintiffs' argument that the board's rule on termination create[d] an employment contract," and then we explained that the plaintiffs still failed to "establish that they had a property interest in continued employment because this contract does not provide a definite term of employment." 214 F.3d at 721. This discussion of the term-of-years presumption came in dicta, whereas ours does not—the *City of Niota* court held that a contract did not exist, while we arrive at the opposite conclusion based on the facts of this case. Further, we read Tennessee law to employ a term-of-years presumption, not a hard-

and-fast rule. Tennessee case law confirms as much: "The mere lack of a definite durational term, however, does not prohibit the existence of other terms to the contract." *Maremont*, 776 S.W.2d at 80. This explains why, in the context of clear and unambiguous terms, municipal employers must follow language regarding termination and discipline in their policy-and-procedures manuals before dismissal—despite the non-existence of a definite durational term. *See, e.g.*, *Hooks v. Gibson*, 842 S.W.2d 625, 627–28 (Tenn. Ct. App. 1992); *cf. Ussery v. City of Columbia*, 316 S.W.3d 570, 578 (Tenn. Ct. App. 2009) (holding that a manual without a term of years still rose to the level of a contract for the sake of employee evaluations and pay increases).

The case of *Hooks v. Gibson* applies with particular force here. There, the Tennessee Court of Appeals examined a police policies-and-procedures manual to determine whether it contractually bound the city to follow its terms when terminating or disciplining officers. The *Hooks* court held that it did. It explained that even though the manual did "not create a term of employment, it repeatedly set[] forth the procedures for terminating employees. The mere fact that the plaintiffs' employment was for an indefinite term is not determinative." *Hooks*, 842 S.W.2d at 627. Just as in *Hooks*, "we are required to enforce" the Police Resolution as a contract "according to [its] terms." *Id.* at 628. And, just as in *Hooks*, we have found not only that the Police Resolution's language created a contract between the City and its officers, but also that the Police Resolution's terms "as to discipline are clear and unambiguous." *Id.* Enforcing these terms leads to one conclusion: the Police Resolution created a contract that established a property right in continued employment subject only to termination for good cause.

## C.

The City advances several counterarguments, none of which persuades us to reach a different conclusion. It points to *England v. Andrews*, No. 2:05-0008, 2005 WL 2209542 (M.D. Tenn. Sept. 8, 2005), as distinguishable from this case. We disagree. According to the handbook language there: "The Jail Administrator may dismiss an employee for just cause, provided any disciplinary action taken by the Jail Administrator can be supported by the evidence strong enough to bear the burden of proof of just cause for such disciplinary action." *Id.* at *2. The district court held that this language changed the employment status from at will to termination only for just cause. *Id.* at *8. It did so with language arguably less clear than that

at issue in this case, *see id.* at \*2, and with language using the permissive term "may," *see City of Niota*, 214 F.3d at 721 ("The term 'may' . . . suggests that there are other permissible means for terminating a city employee."). *England*, in other words, hurts the City rather than helps it.

The City next argues that the handbook did not create a property interest in continuing employment because it provides situations that call for no-questions-asked termination. *See* R. 33-6 at 56 (noting the agency's policy "to terminate members" in situations of (1) economic necessity, (2) performance deficiencies, or (3) where "failing to terminate the member would create an unreasonable risk of negligently retaining" an incompetent employee); *id.* at 57–58. The fact that the Police Resolution lists examples that call for termination without progressive discipline does not undercut our conclusion that the termination must still be for cause. On the contrary, we think this point provides additional support for our conclusion. For example, the Police Resolution explains that an employee may be terminated for "fail[ing] to display the necessary competencies to remain in his or her job position." *Id.* at 56. But a termination under this example—termination without progressive discipline—would still be termination for cause, with the cause being that the employee's skills failed to meet a necessary bar to be deemed competent. Again, because an employee can be terminated without progressive discipline does not change the only unequivocal language in the Police Resolution as it pertains to termination: that "discipline shall be for cause and shall follow the basic concepts of due process." *Id.* at 55.

The City also relies on a possible distinction between "discipline" and "termination." It broadly argues that discipline and termination are two entirely different things; by this argument, according to the City, the Police Resolution's "for cause" language applies only in the context of discipline and not in the context of termination. Tennessee law dictates otherwise. After all, it directs that we interpret this kind of language "in its plain, ordinary, and popular sense." *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008). Any plain, ordinary, and popular understanding of the words would classify termination as a *type* of discipline. This reading makes particular sense given another requirement under Tennessee law for interpreting the Police Resolution: that we interpret its "binding terms" "in the context of the entire handbook." *Rose*, 953 S.W.2d at 692. Applied here, the Police Resolution lists "termination" as one of the steps of "progressive discipline." R. 33-6 at 57.

The City brings a final, related counterargument. It points to the following passage to show that the Police Resolution's terms did not bind the City: "When discipline is deemed appropriate, this agency will use a progressive discipline system when practicable. Furthermore, discipline shall be for cause and shall follow the basic concepts of due process." R. 33-6 at 55. The City contends that the due process language is limited to grievance and disciplinary procedures, but does not apply to terminations. Given that we have already explained that termination is a type of discipline, this argument carries no weight. In any event, the Police Resolution's plain language refutes this counterargument. It provides for a single, unequivocal requirement regarding any kind of discipline (including termination): it "*shall be for cause* and *shall follow the basic concepts of due process*." To this end, progressive discipline is just one kind of discipline, and the fact that the Police Resolution directs that it be applied when practicable does not negate a requirement that an employee can be disciplined—or terminated—only for cause.[2]

## IV.

For the reasons stated, we reverse the judgment of the district court and remand for proceedings consistent with this opinion.

---

[2]Both parties urge us to resolve the rest of this case. From the City's point of view, Freeze and Colvin were given the proper level of process with their dismissal even if they had a property right in their continued employment. The City also argues that defendants benefit from qualified immunity, meaning this case should be dismissed either way. Freeze and Colvin disagree, arguing that they did not receive the proper level of process prior to their dismissal. The district court did not address these arguments and we thus decline to do so here.

---

**DISSENT**

---

GRIFFIN, Circuit Judge, dissenting. I respectfully dissent. I would affirm for the reasons stated by the district court.

Tennessee law presumes that employment is at-will absent "unequivocal language demonstrating the employer's intent" to enter into a contract changing the employment to a just-cause relationship. *Brown v. City of Niota*, 214 F.3d 718, 721 (6th Cir. 2000) (quoting *Reed v. Alamo Rent-a-Car*, 4 S.W.3d 677, 688 (Tenn. Ct. App. 1999). This is a "high standard." *Id*. To that end, permissive language, as in a policy under which an employer "may" fire an employee for cause, is insufficient to convert an employee handbook, such as the Police Manual, into a binding contract with a just-cause termination standard. *See id.* at 721–22.

Here, the district court followed its previous decision in *Madden v. City of Decherd*, No. 4:10-cv-13 (E.D. Tenn. March 27, 2012), to hold that the Police Manual does not contain clear and unequivocal language changing the employment relationship of at-will specified by the City Personnel Policy and presumed by state law. Specifically, as noted by the district court, the Police Manual begins with the following policy statement: "It is the policy of this agency to avoid terminating an otherwise productive member when conduct, behavior or performance problems occur, *if possible*." (Emphasis added.) Further, the section of the Police Manual relied upon by plaintiffs states in full: "When discipline is *deemed appropriate*, this agency will use a progressive system *when practicable*. Furthermore, discipline shall be for cause and shall follow the basic concepts of due process." (Emphasis added.)

Thus, the goal of the Police Manual is progressive discipline "if possible" and when "practicable" and "appropriate" in the judgment of the City. In my view, the Police Manual is riddled with permissive language which does not show an unequivocal intent to bind the City to just-cause employment. The district court, in adopting the magistrate judge's report and recommendation, agreed and quoted *Madden*:

> [The Police Manual] does not conflict with either the presumption that the City of Decherd is an at-will employer or [the Personnel Policy's] explicit statement to that effect. The portion of the [Police Manual] on which Plaintiff relies outlines the Decherd Police Department's "grievance and disciplinary procedures." In its introduction, it provides a general policy statement that: "It is the policy of this agency [i.e., the Decherd Police Department] to avoid terminating an otherwise productive member when conduct, behavior or performance problems occur, if possible." When, in the following section, it defines the processes by which the police department will employ discipline, the Resolution states: "When discipline is deemed appropriate, this agency will use a progressive system when practicable. Furthermore, discipline shall be for cause and shall follow the basic concepts of due process."

(Internal record citations omitted). I see no reason to depart from this rationale, as it is consistent with Tennessee law. *See Brown*, 214 F.3d at 721–22. As in *Madden*, plaintiffs have not shown a protectable property interest by virtue of the Police Manual because they have not shown that the Police Manual created a binding contract between themselves and the City modifying the at-will presumption.

For the foregoing reasons, I would affirm the district court and therefore respectfully dissent.