NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0264n.06

Nos. 19-5862/5866

## UNITED STATES COURTS OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **19-5862** | ) | **FILED**<br>May 11, 2020<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| JUSTIN MEDLIN, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF ALGOOD, TENNESSEE; GARY | ) | |
| HARRIS, in his official and individual capacity; | ) | |
| KEITH MORRISON, in his official and | ) | |
| individual capacity, | ) | |
| | ) | |
| Defendants-Appellees. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| **19-5866** | ) | DISTRICT OF TENNESSEE |
| | ) | |
| VAUGHAN LARSON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF ALGOOD, TENNESSEE; SCOTT | ) | |
| BILBREY, in his official and individual | ) | |
| capacity; KEITH MORRISON, in his official | ) | |
| and individual capacity, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE:  GRIFFIN, WHITE, and NALBANDIAN, Circuit Judges.

HELENE N. WHITE, Circuit Judge.  In these consolidated cases, plaintiffs Vaughan Larson and Justin Medlin appeal the dismissal of their claims, brought under 42 U.S.C. § 1983, alleging that defendant City of Algood, Tennessee (the City) violated their constitutional rights when it terminated their employment with the City.  We affirm.

## I.

Larson and Medlin met through their employment with the City. The two began a relationship and exchanged explicit messages over Facebook. Medlin was also engaged in romantic or sexual relationships with several other city employees, including City Councilwoman Jennifer Green. When Medlin sent a nude photo of himself to a cousin of the Algood police chief, the City began an investigation into Medlin's conduct and searched his electronic devices. The City concluded that Medlin was using a city-provided cellular service to send and receive sexually explicit messages and images. The City suspended Medlin pending an investigation, and he subsequently resigned. By a vote of the city council, Larson's employment was also terminated.

Larson and Medlin both claim that they held a property interest in their continued employment and that the City and its officials denied them due process. Larson claims as well that her property interest in her good name and reputation was damaged by the mayor's statements to the press. Medlin additionally claims that the termination of his employment was retaliation for the exercise of his rights to free speech and intimate association.

### A.

In 2011, Vaughan Larson was appointed to the position of Algood city recorder by the city council. In this role, her duties "included attending all city council meetings, initial meetings, maintenance of the minutes, ordinances, book, financials, accounts payable, payroll, and anything else the city council or city manager might ask." Larson R. 79, PID 1329; L.R. 81, PID 1491 (case 2:17-cv-00079 ("L.R.")). Larson also worked as the city clerk, which involved maintaining city citations and the city court docket. During the relevant period, Larson's supervisor was Keith Morrison, the city manager. Larson testified that her understanding was that she did not have an employment contract with the City and that no one ever told her that she did.

Justin Medlin worked as a police officer and detective for the City of Algood. During the relevant period, Gary Harris served as the police chief and oversaw personnel decisions in the police department, including discipline and firing. Like Larson, Medlin testified that nobody ever told him that he had a contract of employment with the City.

The charter of the City of Algood states that the city recorder is an "officer of the city" to be elected by the city council. L.R. 74-6, PID 915. The charter also includes provisions regarding the removal of certain officials:

> Section 2.17. Mayor, Council Members, and Other Officials May Be Removed from Office by Council. Be it further enacted, that the mayor or any council member or any city official may be removed from office by the city council for the conviction of any crime in office or for grave misconduct showing unfitness for public service, or for permanent disability, by a majority vote of the other members of the city council voting for such removal. The proceedings for such removal shall be upon specific charges in writing, which, with a notice stating the time and place of the hearing, shall be served upon the accused, or published for three (3) consecutive weeks in a newspaper published or circulated in Algood. The hearing shall be public and the accused shall have the right to appear and defend in person or by counsel and have process of the city council to compel the attendance of witnesses on his behalf.

L.R. 74-4, PID 758. In May of 2015, Larson signed a "Receipt of Rules and Regulations Acknowledgement" which stated, "this document is not a contract of employment, and I do not consider it as such." Medlin R. 54-1, PID 328–30, 372 (case 2:17-cv-00080 ("M.R.")). As city recorder, Larson prepared an ordinance for the city council in 2016 that adopted changes to the City's "Personnel Rules and Regulations Employee Handbook." M.R. 54-1, PID 326–32, 372. The handbook laid out a process for disciplining and terminating city employees, including "advance written notice containing the nature of the proposed action" and "the right to a pre-termination appeal hearing." L.R. 74-4, PID 767–68. In another provision, the handbook disclaimed the creation of a contract:

> This is not an employment contract. This document is a statement of current policies, practices, and procedures. These personnel policies, rules, and regulations shall be reviewed periodically. The City reserves the right to change any or all such policies, practices, and procedures in whole or in part at any time, with or without notice to employees.

M.R. 54-1, PID 373. City employees who are not city council members or city officials are subject to discipline pursuant to the handbook.

**B.**

Medlin testified that while he was employed by the City, he engaged in sexual activity with six women, including Larson and Councilwoman Green. Larson testified that she exchanged nude photos with Medlin on several occasions. Larson also testified that she knew Medlin "had a City phone." L.R. 44-1, PID 245. It is undisputed that Larson and Medlin "never engaged in any sexual activity . . . while either of them was on duty or working." L.R. 79, PID 1332–33; L.R. 81, PID 1494. It is also undisputed that "Larson was not aware from which device Justin Medlin was sending sexual photographs." L.R. 79, PID 1335; L.R. 81, PID 1496. Larson testified that any pictures they exchanged were sent through Facebook Messenger exclusively.

According to Medlin, Police Chief Harris gave him the cell phone and told him that he had personally paid for it. Medlin was aware, however, that the service on the phone was provided by the City. The parties do not dispute that Medlin owned the cell phone or that the cellular service was paid for by the City.

Harris testified that in early January 2017, he received a nude picture of Medlin from his cousin that had been sent by Medlin. Harris then met with Morrison and "discussed trying to figure out if [the picture] came from a City phone." L.R. 74-5, PID 876. Harris later confronted Medlin, suspended him from work, and took his phone. Harris then had the phone forensically

examined. Harris later came to believe that Medlin was involved in a plot against him and that another Algood officer, Lieutenant Terry Lindsay, wanted Harris's job.

Morrison testified that in or around January 2017, he met with Harris, who showed him the picture of Medlin's penis that had been forwarded to Harris. Medlin was later placed on administrative leave and the City began an investigation and searched several of Medlin's electronic devices.

In his declaration, Lindsay stated that Harris was suspicious of Medlin and believed "Medlin had too much power and influence over the Algood city council." L.R. 74-7, PID 988. Three or four months before Medlin left the police department, Harris told Lindsay that he wanted to get rid of Medlin "because he had 'too much power.'" *Id.* at 989. Lindsay stated that several months prior to the termination of Medlin's employment, Morrison instructed officers "not to consort with Algood city council members." *Id.* at 989.

Harris testified that he believed Medlin was particularly close to Councilwoman Carolyn Norris, whom Medlin called "mom." L.R. 74-5, PID 862; L.R. 79, PID 1366; L.R. 81, PID 1525. It is undisputed that Medlin and Norris knew each other for five to six years. The two spoke daily about both personal and city business, including meeting agendas, and frequently about Harris, his appointment as the chief of police, and the termination of that employment. Harris also testified that Medlin was close to Councilwoman Jennifer Green. Bilbrey testified that he became aware that Medlin was having an affair with Councilwoman Green after the investigation.

According to Medlin, he was called into a meeting with Harris in which Harris produced a photo that Medlin had sent to Harris's cousin on Facebook. Harris then informed Medlin that Morrison had instructed Harris to send Medlin home. Medlin's attorney later contacted the City's attorney and scheduled a termination hearing. Medlin acknowledged that he had a right to the

hearing, to representation by counsel, to testify, to offer evidence, to question adverse witnesses, and to appeal an adverse result. Medlin, however, resigned before the hearing because he believed he would be fired regardless. Medlin testified that the City permitted him to resign so that he could be paid out for sick days, vacation days, and comp time, which he would not have received had he been terminated. On February 10, 2017, Medlin sent a letter to the city attorney, which stated, in part:

> I have never received a written statement of the allegations against me or the basis for my administrative suspension, so I cannot specifically respond to any charge or allegation other to deny there would be any just reason or cause for my termination. Nonetheless, I believe I have no other option other to resign, which I hereby tender in this letter.

L.R. 79, PID 1301.

Michael Giaimo, Medlin's attorney, stated that he met with Jon Hatfield, the city attorney, prior to the scheduled hearing. According to Giaimo, Hatfield stated "in no uncertain terms Mr. Medlin was going to be terminated at the conclusion of the hearing. There was no indication the pre-termination hearing would be impartial as the evidence had already been considered and weighed." L.R. 74-8, PID 992.

Morrison testified that he "[m]ore than likely" would have served as the official over an appeal hearing, but that he could also appoint a designee. L.R. 74-4, PID 797–98, 838. It was possible, for instance, that the city attorney or a city judge could have filled the role. At the time the hearing was scheduled, Morrison believed the termination of Medlin's employment was justified but stated that he might have changed his mind.

## C.

It is undisputed that on February 21, 2017, Bilbrey and Morrison went into Larson's office where Bilbrey informed Larson of the termination of her employment. Bilbrey recalled giving

Larson some of the investigation materials provided by Morrison, including printed conversations, but did not give Larson any formal notice of charges against her. Bilbrey also recalled telling Larson she had a right to appeal the termination and seek counsel but did not provide a pre-termination opportunity to contest the decision. Bilbrey stated that he did not communicate with Larson between the meeting in her office and the council's later vote to uphold the termination. Bilbrey could not point to a specific policy that Larson violated, but believed her behavior was immoral and that she knew Medlin was using a City-provided phone.

Also on February 21, Bilbrey sent an email to City employees explaining his intention to hold a press conference and stating that the "sexting scandal" would be made public, describing the relevant conduct as "immoral and unethical," and stating that "city owned devices" were used "that citizens bear the burden of expense for." L.R. 79, PID 1452–53; L.R. 81, PID 1601–02. Bilbrey held a press conference on February 24, 2017 that was covered by the media, including News Talk 94.1, which published a story online about the event. The story reported that Scott Bilbrey stated that the city investigated Medlin's "city-owned cell phone," and that Justin Medlin had carried on "sexual relationships with the former city recorder and a city meter reader while the three were on city time." L.R. 79, PID 1448; L.R. 81, PID 1598.

Larson considered the information conveyed by Bilbrey in the press conference to be humiliating and embarrassing. Larson was not present at the conference and only learned about it when it happened. Although Bilbrey did not identify Larson by name, he did identify her by her position. Because of the press conference, Larson had trouble finding employment following her termination.

On February 27, 2017, Larson's attorney sent a letter addressed to the City's attorney, asking if Larson's employment had been formally terminated. Morrison testified that he received the letter but did not respond to it.

Morrison was unsure if Bilbrey had the authority to terminate Larson. According to Morrison, Larson's termination was added to the city-council agenda the night of the March, 2017 council meeting, after Morrison advised the council that they "needed to make a decision whether they were going to reinstate her or terminate her, so that we could have an official decision." L.R. 74-4, PID 782. Morrison did not believe the termination of Larson's employment was official until it was voted on by the full city council. The city council voted to approve Larson's termination. Larson testified that after the vote of the city council, she learned that her employment had been officially terminated.

**D.**

Larson and Medlin filed separate lawsuits under 42 U.S.C. § 1983, alleging that they were denied procedural and substantive due process under the Fourteenth Amendment to the United States Constitution. They also alleged violations of their rights to free speech and association.[1]

The district court consolidated the cases and granted summary judgment to Defendants. Larson and Medlin appeal.

**II.**

This court reviews a grant of summary judgment de novo. *Beecham v. Henderson County*, 422 F.3d 372, 374 (6th Cir. 2005). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he court must view the evidence and draw all reasonable

---

[1] Larson abandons her First Amendment claims on appeal.

inferences in favor of the non-moving party." *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 897 (6th Cir. 2001). "However, '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient' to survive summary judgment; rather, 'there must be evidence on which the jury could reasonably find for the plaintiff.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). The key inquiry for this court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## A. Due Process

Plaintiffs argue that they possessed a property interest in their continued employment and that the City denied them due process in discharging them. Larson Br. at 20; Medlin Br. at 18.

This court undertakes "a two-step inquiry when confronted with due process claims." *Freeze v. City of Decherd, Tenn.*, 753 F.3d 661, 664–65 (6th Cir. 2014). To prevail, Plaintiffs must first establish they had a property interest in their employment protected by the Constitution. *Kuhn v. Washtenaw County*, 709 F.3d 612, 620 (6th Cir. 2013). Second, this court must determine whether Plaintiffs were "afforded the procedures to which government employees with a property interest in their jobs are ordinarily entitled." *Id.* (quoting *Miller v. Admin. Office of Courts*, 448 F.3d 887, 895 (6th Cir. 2006)). "Sufficient pretermination process 'need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story.'" *Id.* (quoting *Gilbert v. Homar*, 520 U.S. 924, 929 (1997)).

**1. Medlin's Due Process Claim**

Medlin argues that he did not voluntarily resign from his position, but "was constructively discharged" because he "had no choice but to resign and reap some financial benefit from his situation." Medlin Br. at 16–18.

"A constructive discharge may constitute a deprivation of property within the meaning of the Fourteenth Amendment." *Nunn v. Lynch*, 113 F. App'x 55, 59 (6th Cir. 2004). Employee resignations, however, are presumed to be voluntary. *Spangler v. Lucas County*, 477 F. App'x 301, 303 (6th Cir. 2012); *Nunn*, 113 F. App'x at 59. "A constructive discharge exists if working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 554 (6th Cir. 2002) (quoting *Yates v. Avco Corp.*, 819 F.2d 630, 636–37 (6th Cir. 1987)). The plaintiff must demonstrate "that 1) 'the employer . . . deliberately create[d] intolerable working conditions, as perceived by a reasonable person,' and 2) the employer did so 'with the intention of forcing the employee to quit . . . .'" *Logan v. Denny's, Inc.*, 259 F.3d 558, 568–69 (6th Cir. 2001) (quoting *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999)).

In *Cleveland v. Southern Disposal Waste Connections*, 491 F. App'x 698, 701 (6th Cir. 2012), Patty Cleveland was suspended from her customer service position after she was unable to explain a customer payment discrepancy. Shortly thereafter, Cleveland met with a supervisor who offered her a voluntary severance package, which Cleveland refused. *Id.* at 701–02. Two months later, another supervisor issued Cleveland a written warning for an unexcused absence. *Id.* After meeting with the supervisor, Cleveland "experienced shortness of breath and chest pains and she also began crying." *Id.* at 702. Cleveland resigned several days later. *Id.* This court reasoned that Cleveland was offered "a voluntary severance package, which suggests that she had the option

to accept the package and was not compelled to resign," and that she did not receive "any pressure from management to accept the package." *Id.* at 708. This court concluded that Cleveland failed to establish a constructive discharge. *Id.* at 708–09.

Here, the City scheduled a termination hearing for Medlin, offering him an opportunity to testify, present evidence, and confront witnesses. Furthermore, Medlin testified that the City permitted him to resign so that he could receive a payout for sick days, vacation days, and comp time. The facts here indicate that Medlin had a choice—to resign with the guarantee of additional compensation or to proceed with the hearing. As in *Cleveland*, there is no indication here that Medlin was pressured to resign, and Medlin is unable to show that the City intended to force him to quit. And, although Medlin asserts that the official who would preside over the hearing had already concluded Medlin should be terminated, the record contains no evidence that a hearing officer had been selected at the time Medlin resigned. Because Medlin resigned "of his own free will, even though prompted to do so by some action of his employer, he . . . cannot contend that he was deprived of his due process rights." *Nunn*, 113 F. App'x at 59 (quoting *Leheny v. City of Pittsburgh*, 183 F.3d 220, 227 (3d Cir. 1999)).

### 2. Larson's Due Process Claim

To prevail on her due process claim, Larson must establish that she had a protected property interest in her continued employment. *Freeze*, 753 F.3d at 665. As an officer of the City, Larson argues that the Algood charter and employee handbook gave her a property interest in her employment.

This court looks to state law to determine if employees have a property intesest in their employment. *Id.* "Tennessee has long recognized the doctrine of employment at will, with the

mutual right of either party to terminate such a relationship with or without cause." *Brown v. City of Niota*, 214 F.3d 718, 721 (6th Cir. 2000). Under the state's contract law:

> [A] contractual interest in continued employment will not be inferred on behalf of an at-will employee from an employer's conduct absent a "show[ing] that the agreement ... was supported by adequate consideration [other than the employee's past services], that there was a mutual assent to the terms of the agreement and that it was sufficiently definite to be enforceable."

*Aldridge v. City of Memphis*, 404 F. App'x 29, 36 (6th Cir. 2010) (quoting *Price v. Mercury Supply Co.*, 682 S.W.2d 924, 933 (Tenn. Ct. App. 1984)). "[W]hat would otherwise be an at-will contract may be modified by specific language which evidences an intent to modify the existent employment contract." *Shelby v. Delta Air Lines, Inc.*, 842 F. Supp. 999, 1006 (M.D. Tenn. 1993), *aff'd*, 19 F.3d 1434 (6th Cir. 1994). "Tennessee courts have recognized that an employee handbook may, under certain circumstances, become a part of the contract of employment between the employee and the employer." *Id.* "In order to constitute a contract, however, the handbook must contain specific language showing the employer's intent to be bound by the handbook's provisions." *Rose v. Tipton County Pub. Works Dep't*, 953 S.W.2d 690, 692 (Tenn. Ct. App. 1997). The Tennessee Court of Appeals has held "that an employer's reservation of a unilateral right to modify the provisions of its employee handbook generally precludes the handbook from being considered part of the parties' employment contract." *Reed v. Alamo Rent-A-Car, Inc.*, 4 S.W.3d 677, 688 (Tenn. Ct. App. 1999). This proposition does not apply, however, in cases "where the employer also has included within its handbook unequivocal language demonstrating its intent to be bound by the handbook's provisions." *Id.* "[T]he *Reed* court announced a high standard for establishing the existence of an employer's specific intent to be bound by the terms of an employee handbook." *City of Niota*, 214 F.3d at 721. Relevant provisions must be "interpreted in the context of the entire handbook, and read in conjunction with any other relevant

material." *Rose*, 953 S.W.2d at 692 (quoting *Claiborne v. Frito–Lay, Inc.*, 718 F. Supp. 1319, 1321 (E.D. Tenn. 1989)).

In *Freeze*, two police officers claimed that "the City terminated their employment in violation of their Fourteenth Amendment right to due process." 753 F.3d at 664. The city's Board of Mayor and Aldermen had passed a resolution creating an employee manual for the police department. *Id.* at 663. The resolution stated that "discipline shall be for cause and shall follow the basic concepts of due process" and outlined a five-step, progressive system of discipline mandating that employees "be informed in writing of the 'exact offense violated.'" *Id.* at 663–64. The officers argued that the resolution "created a contract that changed their status from at-will employees to those with a property right in continued employment." *Id.* at 665. This court found that the resolution contained "unequivocal language demonstrating the City's intent to be bound by the handbook's provisions." *Id.* at 666. Specifically, the resolution provided "[t]hat all resolutions or parts of resolutions in conflict herewith are hereby repealed to the extent of that conflict" and thus "plainly state[d] that the Police Resolution trump[ed] any other conflicting agreements pertaining to police-officer employment." *Id.* Second, the resolution contained "unequivocal terms demonstrating an intent to be bound to an agreement prohibiting termination without good cause." *Id.* Specifically, the resolution stated "in plain language that 'discipline *shall be for cause and follow the basic concepts of due process*.'" *Id.* Third, considering the "context of the entire handbook," there was nothing in the resolution that detracted from the language mandating termination for cause. *Id.* at 667 (quoting *Rose*, 953 S.W.2d at 693–94). This court held that the facts met the standard necessary "for a handbook or manual to create not just a contract, but also a property right." *Id.* at 665–66.

Like the handbook in *Freeze*, the handbook here uses mandatory language to describe the pre-termination hearing process. Unlike the *Freeze* handbook, however, the "context of the entire handbook" here makes clear that the City did not intend to be bound by the handbook's provisions. The handbook states that it "is not an employment contract" and that the City "reserves the right to change any or all such policies, practices, and procedures in whole or in part at any time, with or without notice to employees." M.R. 54-1, PID 373. There is "no clearer way for an employer to express its intent not to be bound by an employee handbook's provisions than the employer's specific statement that the handbook is not a contract or that the handbook should not be construed as a contract." *Reed*, 4 S.W.3d at 688 (quoting *Adcox v. SCT Prods.*, No. 01A01–9703–CV–00123, 1997 WL 638275, at *4 (Tenn. App. Oct. 17, 1997)).

Larson further relies on a charter provision that states that "any city official may be removed from office by the city council for the conviction of any crime in office or for grave misconduct showing unfitness for public service, or for permanent disability, by a majority vote of the other members of the city council voting for such removal" and details the proceedings for such a removal. Larson Br. at 20–21.

This argument would give us pause were it not for Tennessee law clearly to the contrary. The Tennessee Court of Appeals considered a substantially similar charter provision in *Ogburn v. Gas & Water Department*, No. 01A01-9702-CH-00056, 1997 WL 528812 (Tenn. Ct. App. Aug. 27, 1997). The charter in *Ogburn* read:

> The mayor or any alderman or any city official or employee may be removed from office by the City Council for any crime, misconduct, unfitness or disability by vote of the City Council. The proceedings for such removal shall be upon specific charges in writing, which, with a notice stating the time and place of the hearing, shall be served upon the person so charged or left at his or her usual place of residence. The hearing may be public and the accused shall have the right to appear and defend . . . .

*Id.* at *4. In rejecting Ogburn's argument, the court reasoned that the charter used the permissive word "may" and did "not state that this is the only method that the city may use to discharge a city employee, or that the causes mentioned in the charter provision are the only legitimate reasons for which an employee may be terminated." *Id.* at *5. The court concluded that the charter did not create a constitutionally protected property interest. *Id.*

The City of Algood's charter mirrors the charter considered in *Ogburn*. Although this court is not bound by *Ogburn*, "[w]e will accept the holding of a state intermediate appellate court with respect to state law unless we determine the highest court of the state would decide otherwise." *Aldridge*, 404 F. App'x at 35 (quoting *United States v. Philp*, 460 F.3d 729, 732 (6th Cir. 2006)). As Larson has not given us reason to believe that the Tennessee Supreme Court would hold to the contrary, *Ogburn* compels the conclusion that the Algood charter did not create a property interest in her continued employment.

Further, Larson testified that her understanding was that she did not have an employment contract with the City, that she was never told she had a contract, and that she signed an acknowledgment that she did not have a contract. Larson is unable to establish that she had a protected property interest in her continued employment.

### 3. Larson's Good Name and Reputation

Larson also argues that "she has a property interest in her good name and reputation" and that it was "damaged by Scott Bilbrey and his unnecessary and purely vindictive post-termination media tour." Larson Br. at 26.

"[A] person's reputation, good name, honor, and integrity are among the liberty interests protected by the due process clause of the fourteenth amendment." *Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002) (quoting *Chilingirian v. Boris*, 882 F.2d 200, 205 (6th Cir. 1989)). "[B]efore

a person is deprived of either a liberty or property interest, he has a right to some kind of hearing." *Id.* at 319. "A name-clearing hearing is required only if the employer creates a false and defamatory impression about a particular employee in connection with his termination." *Id.* at 320. "It is the denial of the name-clearing hearing that causes the deprivation of the liberty interest without due process." *Id.* "[T]his Court has consistently held that a plaintiff's failure to request a name-clearing hearing is fatal to a claim alleging a deprivation of a liberty interest without due process." *Id.* at 323. Moreover, "this Court has never imposed an affirmative duty on an employer to apprize the employee of his right to a name-clearing hearing." *Id.*

Although the situation was undoubtedly stressful and the status of her employment was unclear, Larson concedes that she never requested a hearing despite consulting an attorney. Larson also testified that by the March city-council meeting, she was aware that her termination was official. Even after this confirmation, Larson did not request a hearing of any kind.

"[A] plaintiff who fails to allege that [she] has requested a hearing and was denied the same has no cause of action, whether or not [she] had been informed of a right to a hearing before filing suit." *Quinn*, 293 F.3d at 324. Because there is no evidence Larson requested a hearing, she cannot prevail on a claim for deprivation of due process.

### B. Medlin's Remaining Claims

Medlin argues that "the true motivation of his discipline and termination . . . was retaliation for the exercise of his right guaranteed by the First Amendment." Medlin Br. at 25. First, he claims that the City violated his "right to maintain intimate associations." *Id.* at 26. Second, he claims the City violated his "right to associate and speak to members of the Algood city council." *Id.* at 28. Finally, Medlin argues that the City's actions "shock the conscience." Medlin Br. at 27–28.

**1. Intimate Association**

Medlin argues that he had a "right to associate and speak to members of the Algood city council" and that Harris decided to "root him out of the force" for exercising his constitutional rights. Medlin Br. at 28.

"For a retaliation claim to survive summary judgment," the plaintiff must establish a genuine dispute of material fact as to three elements:

> "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two," that is, the defendants' adverse action was "substantially motivated by the exercise of [the plaintiff's] constitutional rights."

*Dade v. Baldwin*, No. 19-3621, 2020 WL 534060, at *3 (6th Cir. Feb. 3, 2020) (alteration in original) (quoting *Sowards v. Loudon County*, 203 F.3d 426, 431, 433–34 (6th Cir. 2000)). Here, Medlin cannot satisfy the first element.

"The Supreme Court recognized the First Amendment right to freedom of association in intimate human relationships." *Gaspers v. Ohio Dep't of Youth Servs.*, 648 F.3d 400, 414 (6th Cir. 2011) (citing *Roberts v. United States Jaycees*, 468 U.S. 609 (1984)). The Sixth Circuit has determined that a "[p]ersonal friendship is protected as an intimate association." *Akers v. McGinnis*, 352 F.3d 1030, 1039–40 (6th Cir. 2003). This court has also noted, however, that "[w]hile there are relationships other than those between family members that may be afforded constitutional protection, it does not follow that *any* relationship that could be objectively qualified as 'intimate' should be protected." *Marcum v. McWhorter*, 308 F.3d 635, 640 (6th Cir. 2002). The determination whether a particular relationship is protected by the Constitution depends on its characteristics:

> To determine the limits of state authority over an individual's freedom to enter into a particular association, it is the task of the court to engage in "a careful assessment of where that relationship's objective characteristics locate it on a spectrum from

> the most intimate to the most attenuated of personal attachments," taking into consideration factors that may include "size, purpose, policies, selectivity, congeniality, and other characteristics" that may be pertinent. *Rotary* added that while the exact boundaries of this type of constitutional protection were not marked, it is not restricted to relationships among family members. The Court emphasized that protection is afforded to those relationships that "presuppose deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life."

*Id.* at 639–40 (citations omitted) (first quoting *Roberts*, 468 U.S. 609, 620 (1984); then quoting *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987)).

In *Marcum*, this court considered Marcum's argument that he was fired from his position as a deputy sheriff because of his relationship with Abbott, an informant Marcum met during his work. 308 F.3d at 638. "From the initial meeting until their cohabitation, Marcum and Abbott were just 'good friends' whose respective spouses and families were social acquaintances whose association was marked by family outings and get-togethers." *Id.* at 637. After Marcum and Abbott separated from their respective spouses, they moved in together and began a sexual and romantic relationship. *Id.* at 638. "After learning of this living arrangement, Sheriff Catron told Marcum that either he or Abbott would have to move out. Marcum was discharged . . . upon his perceived failure to comply with Catron's directive." *Id.* This court found that Marcum failed to show "how his decision to enter into an intimate, sexual relationship and cohabitation with a married woman is a fundamental right deeply rooted in the Nation's history and tradition or implicit in the concept of ordered liberty." *Id.* at 643. This court held that "[t]hough perhaps unfair, his dismissal did not infringe his right of association." *Id.*

The record indicates that Medlin had close relationships with two city councilwomen, Green and Norris. Medlin testified that he spoke to Green about "relationships," engaged in sexual activity with Green, and spoke to her on the phone while on duty. L.R. 45-1, PID 289–92. Harris testified that Medlin and Green were "close." L.R. 74-5, PID 862. Bilbrey testified that Medlin

and Green had an extramarital affair. There is no evidence that would suggest Medlin's relationship with Green was as intimate or personal as the relationship considered in *Marcum*, which did not receive constitutional protection. Without more, Medlin cannot show that the relationship "involved an attachment to an individual with whom [he] shared the 'distinctly [sic] personal aspects of [his] life.'" *Anderson v. City of LaVergne*, 371 F.3d 879, 882 (6th Cir. 2004) (third alteration in original) (quoting *Roberts*, 468 U.S. at 620).

The evidence regarding Medlin's relationship with Norris is similarly sparse. Lindsay stated that Medlin spoke frequently with Norris. Harris testified that Medlin was particularly close to Norris and called her "mom." L.R. 74-5, PID 862; L.R. 79, PID 1366; L.R. 81, PID 1525. Medlin and Norris knew each other for five to six years. The two spoke daily about both personal and city business, including meeting agendas, and frequently about Harris, his appointment as the chief of police, and the termination of Harris's employment.

In *Bracken v. Collica*, 94 F. App'x 265, 266 (6th Cir. 2004), the City of Streetsboro's law director, Martin, appointed Bracken to be his assistant. The mayor later terminated Bracken's employment. *Id.* Bracken filed suit, claiming "that she was fired because of her association with Martin." *Id.* at 269. The court noted that "as Martin's full time assistant, Bracken was in a close relationship with Martin. Also, it was Martin who originally nominated her for the job." *Id.* at 270. The court concluded that although the relationship was "close," Bracken did not allege "that she and Martin had the kind of highly intimate relationship which the First Amendment protects." *Id.*

Here, the evidence regarding the relationship between Medlin and Norris is similar to that considered in *Bracken*. Although the record indicates that Medlin and Norris were close, there is little indication that the relationship was "distinguished by such attributes as relative smallness, a

high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Roberts*, 468 U.S. at 620. Medlin has not provided sufficient evidence to establish that his relationship with Green or Norris was protected by the right to intimate association.

### 2. Speech

Medlin asserts that "[h]e had an absolute right to speak out on matters of public concern." Medlin Br. at 28. Medlin argues that "Harris had grown paranoid and upset about the Appellant's apparent growing influence with the city council" and that Harris believed Medlin should not be "communicating or fraternizing with the city council members." *Id.* Medlin claims that "the true motivation of his discipline and termination . . . was retaliation for the exercise of his right guaranteed by the First Amendment." *Id.* at 25.

> Again, this court considers three elements in a retaliation claim:
>
> A plaintiff seeking to establish a case of retaliation for speech protected under the First Amendment must point to evidence sufficient to establish three elements: 1) the plaintiff engaged in constitutionally protected speech; 2) the plaintiff was subjected to adverse action or was deprived of some benefit, and 3) the protected speech was a "substantial" or a "motivating factor" in the adverse action.

*Brandenburg*, 253 F.3d at 897 (6th Cir. 2001) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). Regarding the first element, this court employs a two-part test. *Id.* "The first part of the test requires the court to ask whether the speech at issue addressed a matter of public concern." *Id.* "Next, the court must decide whether 'the interest of the employee as a citizen, in commenting on matters of public concern, outweighs the employer's interest in promoting the efficiency of the public services it performs through its employees.'" *Id.* at 897–98 (quoting *Perry v. McGinnis*, 209 F.3d 597, 604 (6th Cir. 2000)).

To determine whether speech addressed a matter of public concern, "we will consider (1) the point or focus of the speech in question and (2) whether the point 'relat[es] to any matter

of political, social, or other concern to the community.'" *Rodgers*, 344 F.3d at 600 (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). The Supreme Court has "instructed that '[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement.'" *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004) (alteration in original) (quoting *Connick*, 461 U.S. at 147–48).

Defendants argue that "Medlin does not identify any 'speech' that is a matter of public concern." Algood Br. at 46. The evidence that Medlin spoke to city-council members regarding a matter of public concern is limited to Medlin's testimony that he would speak to Norris about city business and frequently about Harris, his appointment as the chief of police, and the termination of that employment.

"[T]he employee bears the burden of proving his or her actions were constitutionally protected in the particular circumstances." *Brandenburg*, 253 F.3d at 897. Medlin has not provided enough evidence to begin the analysis. The record does not disclose, and Medlin does not explain, "the content, form, and context" of the allegedly protected statements. *Connick*, 461 U.S. at 147–48. With only a vague description of the topics he discussed with Norris, we cannot conclude that Medlin's speech addressed a matter of public concern. "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id.* at 146.

### 3. Shocks the Conscience

Medlin asserts that the test for his "due process claim is whether the action 'shocks the conscience' of the court." Medlin Br. at 27–28. However, Medlin does not state which action by the City "shocks the conscience." Medlin Br. at 2–3. It also appears that Medlin did not present

this argument before the district court.[2]  "Generally, we will not address arguments raised for the first time on appeal."  *Frazier v. Jenkins*, 770 F.3d 485, 497 (6th Cir. 2014).

In any event, there is no indication in the record that any of the actions of the City or its officials rose to the level of "conscience shocking, in a constitutional sense."  *Collins v. City of Harker Heights*, 503 U.S. 115, 116 (1992).  The conscience-shocking "characterization applies to only the most egregious official conduct, conduct that is so brutal and offensive that it [does] not comport with traditional ideas of fair play and decency."  *Doe v. Miami Univ.*, 882 F.3d 579, 599 (6th Cir. 2018) (alteration in original) (quoting *Handy-Clay v. City of Memphis*, 695 F.3d 531, 547–48 (6th Cir. 2012)).  Medlin has not provided sufficient evidence to establish that the City's actions shocked the conscience.

### III.

Based on the foregoing, we AFFIRM the grants of summary judgment.

---

[2] Below, Larson argued that "the actions of Scott Bilbrey on behalf of the City of Algood, in addition to the inaction of Keith Morrison, shocks the conscience."  M.R. 80, PID 1252-53.  Medlin did not list this as one of his claims before the district court and the district court interpreted this argument as limited to Larson.